John FEARANCE, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 63342.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 17, 1980.

On Rehearing May 27, 1981.

J. Thomas Sullivan, Preston DeShazo, Dallas, for appellant.

Henry Wade, Dist. Atty., W. T. Westmoreland, Jr., Douglas D. Mulder, Norman Kinne, David Schick and John Hagler, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. After the jury answered yes to the three special issues under Art. 37.071(b), V.A.C.C.P., punishment was assessed at death.

Appellant was convicted of having murdered Larry Faircloth during the course of a burglary on December 23, 1977, in Dallas. The deceased died as a result of multiple stab wounds.

In his twelfth ground of error, appellant contends that the trial court erred in sustaining the State's challenge for cause to prospective juror Patricia Randolph. He maintains that exclusion of Randolph was in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

The prosecutor initially questioned Randolph on voir dire concerning her general attitude with regard to the death penalty. In this regard, the record reflects as follows:

"Q. (Prosecutor)

". . . Therefore, I want first of all to ask you how you feel generally with regard to the issue of capital punishment. By that I mean are you in favor of it, against it, have some specific religious or moral objections to it, and, if you would, I'd ask you to share your thoughts with us and with the Court as to how you feel about the issue of capital punishment.

"A. Well, the only objections I would have to capital punishment would be the circumstances involved in the crime that was committed.

"Q. You are saying that you would be in favor of it in certain instances?

"A. Yes, sir.

\*       \*       \*       \*       \*       \*

"Q. . . . Do you feel that under the proper circumstances you could consider and assess the death penalty as the punishment for a person who has committed a murder during the course of a burglary?

"A. Yes."

Randolph was then questioned for a short time concerning a personal data information sheet she had filled out. The prosecutor then explained certain rules of law to Randolph such as proof beyond a reasonable doubt, the presumption of innocence and the defendant's right not to testify. Randolph stated that she understood these rules and would follow them if selected to sit on the jury.

The prosecutor then explained the procedure at the punishment phase of the trial. Randolph acknowledged that she understood the three special issues under Art. 37.071(b), supra, and that depending upon the evidence, the answer to a special issue might be yes or no. She stated that she could answer any of the issues yes or no depending upon the evidence presented at trial.

Randolph was informed that if all the special issues were answered yes, the defendant would be sentenced to death. With respect to whether this knowledge would affect her deliberations, the record reflects:

"Q. ... Now, knowing ahead of time what the ultimate result would be, do you feel that that would in some way affect your deliberations or your answers to those three questions?

"A. I'd have to say yes.

"Q. You feel that it would?

"A. Yes.

"Q. Well, I just want you to be honest with us and I appreciate your being honest with us. Now, just so that I understand you: Knowing ahead of time that the Defendant would either get a maximum sentence of life or death and knowing what would occur, depending on how you answered the questions, you do feel that that would enter into your deliberations in answering the three questions?

"A. Well, I'd have to answer all—each question on an individual basis to the best of my ability and my honesty to myself. I'd take each question on an individual basis and not as a whole.

"Q. Right. Okay, and I'm not suggesting you wouldn't answer them truthfully. My question—maybe that last one was confusing there; at least it wasn't in line with what I'd asked you before. Do you feel that, although you'd be answering the questions truthfully, that your answers to the three questions would be affected by the fact that you already know what the ultimate outcome would be?

"A. Yes.

"Q. Let me twist that around; I'm going to have to ask it to you again and try to follow me, if you would, please: Can you or would you be able to state under oath that the mandatory sentence of life or death would not affect your deliberations or answers to those three questions of fact?

"A. No.

"Q. You could not state under oath that it would not affect your—

"A. It would—it would affect me, yes; it would have to."

Following the above answers, Randolph was challenged for cause by the State. The challenge was sustained by the trial court over appellant's objection that:

"MR. DeSHAZO: Your Honor, at this time the defense would object to the Court excusing the venire lady, Patricia Randolph, for cause for the reason that a systematic exclusion of veniremen under 12.31(b) violates our right to a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution...."

V.T.C.A. Penal Code, Sec. 12.31(b),[1] recently came under scrutiny by the United States Supreme Court in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The Court found the statute to be constitutional and that "[t]he State could, consistent with *Witherspoon*,[2] use Sec. 12.-31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths." It was noted that "[i]f the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not vio-

---

1. That section provides as follows:
   "Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

2. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

late the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality."

However, the Court found that the State had impermissibly used Sec. 12.31(b), supra, as a ground for challenge against several prospective jurors in Adams' trial. These veniremen were excused after they stated that the possibility of the death penalty would have an affect on their deliberations. In finding their exclusion to be improper, the Court noted:

"Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. Such assessments and judgments by jurors are inherent in the jury system and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law." *Adams v. Texas*, 100 S.Ct. at 2529.

In the instant case, Randolph stated that she could consider and vote for the death penalty for one who committed a murder during the course of a burglary. She acknowledged that she understood the three special issues under Art. 37.071(b), supra, and could answer those questions yes or no depending upon the evidence presented at trial. However, Randolph was excused, over appellant's objection, after she stated that the possibility of the death penalty would affect her deliberations or answers to the three special issues.

We find that Randolph's testimony showed that she would consider the evidence and honestly answer the three special issues. The mere fact that the death penalty would have an affect on her deliberations or answers was not a sufficient basis upon which she could have been challenged and excused for cause. We hold that her exclusion for cause was inconsistent with *Witherspoon*.

The judgment is reversed and the cause remanded.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

CLINTON, Judge.

On original submission the Court reversed the judgment of conviction and remanded the cause for a new trial, deciding only that a prospective juror had been improperly excused under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), given the judicial gloss applied to V.T.C.A., Penal Code, § 12.31(b) recently by the Supreme Court of the United States in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In his motion for rehearing appellant complains that we did not but should rule on several of his forty five grounds of error which do not present voir dire error and additionally, that our disposition of the cause—remand for a new trial should the State be so advised—is improper; we granted appellant leave to file his motion in order to address his complaints.

▮ At the outset we reject the contention that the initial disposition of the cause on a finding of *Witherspoon* violation alone was incorrect. That we will not reform the verdict of the jury reached at the punishment stage in such a way as to render judgment of life imprisonment is now settled by the action of the Court overruling the State's motion for rehearing in the Grijalva-Loudres-Pierson trilogy April 29, 1981.[1]

---

1. *Grijalva v. State*, 614 S.W.2d 420 (Tex.Cr. App., 1980); *Loudres v. State*, 614 S.W.2d 407 (Tex.Cr.App., 1980); *Pierson v. State*, 614 S.W.2d 102 (Tex.Cr.App., 1980). See also *Ev-* ans *v. State*, 614 S.W.2d 414 (Tex.Cr.App., 1980) in which State's motion for rehearing was also overruled April 29, 1981.

■ Still at the threshold, we are confronted with ground of error one, reading:

"The Texas Death Penalty Statute is unconstitutional because it is inflicted as a result of prosecutorial discretion which is not limited by guidelines or standards for determining its appropriateness in individual prosecutions."

This ground is derived from the trial court's overruling a motion to dismiss the indictment to the same effect, after hearing testimony from two local prosecutors concerning factors considered in coming to respective conclusions to treat the potentially indictable capital murder case as murder in two particular matters. The thrust of that testimony, appellant says, is to show that the "only standard" utilized is "the strength of the State's case," and he points out that one is not incorporated in V.T.C.A.Penal Code, § 19.03(a)(2). Yet, the notion that authority of a state prosecutor to select those persons whom he wishes to prosecute for a capital offense must be fettered by guidelines was dispelled generally by the Opinion of Stewart, Powell and Stevens, JJ. in *Gregg v. Georgia,* 428 U.S. 153, 199, n. 50, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1975); and the standard appellant claims to have shown is the very one assumed by White, J., concurring in judgment, with whom The Chief Justice and Rehnquist, J., joined, in finding it "does not cause the system to be standardless," *id.,* at 225, 96 S.Ct. at 2949.[2] Contemporaneously, and "for the reasons set out in our opinions today in *Gregg v. Georgia,*" a similar contention was rejected in *Jurek v. Texas,* 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976), causing the Court to do the same in *Livingston v. State,* 542 S.W.2d 655, 662 (Tex.Cr.App. 1976). The statute is not unconstitutional for the reason suggested by appellant in this ground of error. It is, therefore, overruled.

The indictment in this case alleged that kind of capital murder that is denounced by a combination of V.T.C.A.Penal Code, §§ 19.02(a)(1) and 19.03(a)(2); that is, that on the alleged date and in the stated county appellant did "intentionally cause the death of ... Larry Faircloth ... by stabbing ... [him] with a knife ... while ... in the course of committing and attempting to commit the offense of burglary." The charge of the trial court to the jury abstractly defined burglary, in part, if one enters a habitation "with intent to commit a felony or theft," and in applying the law to the facts authorized the jury to convict if it found that appellant caused the death of the deceased while "in the course of committing or attempting to commit the offense of burglary, *as that term has heretofore been defined to you* ..."[3] Thus, the finding of guilt is based, in part, on the theory that the undisputed entry was with intent to commit either a felony or theft.

The next string of grounds of error, numbers two through six, along with the last one, number forty six, relate to the state of the evidence in sundry respects. To treat these issues we must review the testimony, but since the basic facts are not controverted their record-referenced recitation by the State is the source of much of what is about to be related.

Vicki Benavidez, her ex-husband, Roland and her two small children arrived at Vicki's home at approximately 11:30 p. m. on Thursday, December 22, 1977, having attended a motion picture. They found lights on which had not been on earlier when they left for the movie. They had gone out the back door which, when they returned, was bolted from the inside. Missing from the residence were Christmas presents, food, beverages, jewelry, two steak knives and a butcher knife. In addition, a key to the residence, which had been left on the television was missing. A report of this burglary was made to the Dallas Police Department.

2. "Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficient."

3. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

Roland Benavidez agreed to spend the night because of the possibility that the burglar, who now had a key to the residence might return. Vicki and Roland retired sometime after midnight.

Meanwhile, in her nearby, two-story house, Betty Faircloth fell asleep in bed on the evening of December 22, 1977, with the bedroom television on. Her husband, Larry Faircloth, woke her up and told her that someone had broken into the house; the Johnny Carson Tonight Show was on at the time. She got out of bed and saw that the stairway light was on. It had not been on earlier. At this point appellant came into the bedroom and a struggle between appellant, Larry and Betty ensued. Appellant stabbed Betty in the abdomen with a knife. Betty went to the phone to call the police as appellant was stabbing Larry. Larry fell face down on the bed, appellant straddled him and stabbed him a number of times in the back. Appellant then came toward Betty, who turned her back to him to protect the telephone, and stabbed her twice in the back. Larry stood up, only to fall back to the floor; appellant ran from the room.[4]

Betty completed her call to the police, though not without difficulty. The stab wounds had penetrated both her lungs and she was having problems breathing. Betty then went downstairs to await the arrival of the police and let them in. She was unable to get back upstairs.

Back at Vicki's house, Roland Benavidez heard a key turn in the back door lock. The door could not be opened because it was also bolted. Roland arose and armed himself with a knife. He then heard a key being turned in the front door lock; the door was secured with a chain. Roland went to the front door, unfastened the chain and jerked the door open. Appellant was there, his hands bleeding badly; he said that he had been hurt and would like to use the telephone. Roland shut the door and called the police. He gave the police a description of appellant and the clothing he

was wearing and then went out into the front yard to await the police.

The police broadcast, transmitting an account given by Betty Faircloth's report, initially characterized the incident as a shooting. Officer Hull and his partner, on patrol when they heard this call, went to the Faircloth residence; they were admitted by Betty Faircloth, who gave them a description of appellant and the clothing he was wearing. They observed Larry Faircloth beside the bed in an upstairs bedroom in a large pool of blood. He was breathing heavily. Two ambulances arrived and took Larry and Betty Faircloth to Parkland Hospital where he died.

The autopsy indicated nineteen stab wounds and that Larry had bled to death. He also had defensive cuts on his hands.

Officer Jarvis of the Dallas Police Department Crime Scene Search Section arrived at the Faircloth residence. He ascertained that the molding which held the glass in French doors in the rear of the Faircloth residence had been removed and broken and that two panes of glass had also been removed. He took photographs of the French door and molding, but was unable to lift any readable latent prints. He also found a steak knife in a pool of blood under the edge of Larry Faircloth's bed. This knife was admitted into evidence.

Officer Meek, on patrol alone, heard over the police radio the report of the incident at the Faircloth residence and also of the prowler at the Benavidez residence; he answered the latter. He got a description of the prowler from Benavidez. Meek saw a trail of blood going away from the Benavidez residence. Meek was joined by Officer Barber; while Barber radioed the description of the prowler Meek followed the trail of blood. The blood trail led to an apartment which was later determined to be appellant's residence.

Meek radioed a call for assistance from his patrol car and returned to appellant's

---

4. Along the way from where appellant gained entry to the bedroom were many items of portable personal property, including a wallet and money, which appellant emphasizes and the State concedes were not disturbed while appellant was inside the house.

apartment where he was joined by Officer Barber. Meek was aware that Officer Hull had made a broadcast from the Faircloth residence changing the shooting call to a cutting and stabbing call and giving a description of the suspect as a black male approximately 5'8" tall wearing a navy blue or black toboggan cap and a blue denim coat and pants which matched the description that Benavidez had given Meek. Meek knocked on the door, called out that he was a police officer and to open the door. A woman's voice responded, "Wait a minute, wait a minute." Meek was not sure whether she was talking to him or to someone inside, but she sounded frightened. When she opened the door, the officers rushed in and inquired as to the whereabouts of the man. The woman pointed to the bathroom. Appellant was found in there and was taken into custody. He was nude and was washing clothes in the bathtub full of water and blood. Officer Barber observed bloody clothes and bloody shoes on the bathroom floor and rags and clothes in the tub of bloody water. After appellant was handcuffed Officer Barber undertook to determine whether anyone else was in the apartment who might attempt to harm the officers. Officer Barber observed a bloody shirt in a bedroom and an army field jacket in the kitchen and a bloody butcher knife in the kitchen sink. He also saw a denim coat on a table in the living room.

Officer Barber seized the various items which he had observed in plain view during his tour of the apartment and certain of them were received in evidence over appellant's objection.[5] The items included a bloody shirt, a blue denim coat, a dark navy blue toboggan cap, blue pants, a butcher knife, a pair of socks, a T-shirt, a pair of blue trousers, and blood stained shoes. In the pocket of the denim jacket were found Vicki's jewelry and the house key to her house. A piece of wooden molding was also

in the coat; it was shown by scientific evidence to match the molding broken off of the Faircloth residence.

Sgt. Williams was on patrol in the downtown area when he heard the call regarding the prowler and Officer Meek's request for assistance at appellant's apartment. He answered the latter call and went to the apartment. Williams was able to follow the trail of blood all the way from the apartment to the Faircloth residence.

Samples were collected of the blood at appellant's residence, both inside and outside, the blood trail, blood at the Benavidez residence, and blood at the Faircloth residence.

Sara Williams, a forensic serologist, testified that she had examined known samples of appellant's blood and of the blood of the deceased. Through application of the ABO and MN systems, she determined that approximately .018 percent of the population had blood of appellant's type, and that .00354 percent of the population had blood of the type of the deceased. Among other things, Williams found that the blood on the steak knife was compatible with blood of the deceased as was the blood on the butcher knife.

Since the case must be reversed for the *Witherspoon* error, though the evidentiary contentions made by appellant will be addressed, we shall be chary in our comments lest they unduly influence a new trial.

In his second ground of error appellant contends the evidence raises the issue of whether there is demonstrated an intentional act of murder or a killing during a struggle after a breakin. He opts, of course, for the latter and concludes, then, that the evidence is not sufficient to support a judgment of conviction for capital murder. His third ground similarly asserts the affirmative answer to special issue one is infirm.

---

5. In grounds of error thirty four and thirty five appellant contests the admission of such tangible evidence and several photographs taken of the interior of the apartment, respectively. As with the other grounds that appellant does not now advance for our decision, we pretermit consideration of the issue, noting merely that

the factual setting smacks of *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)—lacking, however, its consent to enter, an element that did not trouble the Court in the somewhat similar situation confronted in *Nichols v. State*, 501 S.W.2d 107 (Tex.Cr.App.1973).

*Warren v. State*, 562 S.W.2d 474 (Tex.Cr. App.1978) is the single authority cited and discussed. But *Warren* is wide the mark of the ground of error, for in the respect appellant would use it *Warren* concluded the evidence was insufficient to support an affirmative answer to special issue two—"future dangerousness."

■ On the other hand, resort to other determinations of evidentiary sufficiency for special issue one is instructive for we now know that "deliberately," as used in that question of the charge on punishment, is not the linguistic equivalent of "intentionally," as used in the charge on guilt-innocence, *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981); rather, it is the thought process which embraces more than a will to engage in conduct and activates the intentional conduct.[6] Thus, we may say that the repeated stabbing of Faircloth by appellant while astride him is enough like the conduct that caused the death of the deceased in *Duffy v. State*, 567 S.W.2d 197, 209 (Tex.Cr. App.1978) to find it was done deliberately and, perforce, intentionally. *Granviel v. State*, 552 S.W.2d 107, 123 (Tex.Cr.App. 1976) cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). The grounds of error are overruled.

Adverting to that feature of the charge we noted *ante* abstractly included an entry to murder or steal, and because in its charge the court abstractly also defined murder and then instructed the jury that murder is a felony, in his ground of error number four appellant perceives a possibility that the jury may have believed he entered to commit murder rather than theft and asserts the evidence is not sufficient to support any such finding. Be that as it may, the ground of error does not present a pure evidentiary issue, intertwined as it is with one possible construction of the

charge. The matter has become academic for in the event of a new trial it may not be again presented. We overrule the fourth ground of error.

Ground of error five states that the conviction "is barred by the felony merger doctrine" and, again pointing to the "either-or" feature of the charge with respect to the intent with which appellant may have made his entry, he lays down a premise derived from "the theory advanced by the State in argument" to the effect that the burglary was based on his intent to commit murder. From that flows an argument that the State thus made "double use" of the offense of murder which should be precluded "by the merger of intent into one offense." The State may or may not abandon the perceived theory, but we do not regard the matter as a real sufficiency of evidence problem that would bar another trial at all. The fifth ground of error is, accordingly, overruled.

■ The sixth ground of error turns the coin over, and asserts lack of evidence to show entry with intent to commit theft. The State insists there is enough evidence, invoking the presumption that flows from "the act of breaking and entering a building at nighttime," which the Court seemed to have grafted into the new penal code in e. g., *Clark v. State*, 543 S.W.2d 125 (Tex.Cr. App.1976), and by often dropping the element of "breaking"—just as the code discarded it[7]—in, e. g., *Jones v. State*, 587 S.W. 115, 117, 119 (Tex.Cr.App.1979) and *Moss v. State*, 574 S.W.2d 542, 544 (Tex.Cr. App.1978). For present purposes the presumption that obtained in connection with his entry into the Faircloth residence around midnight does show the intent to commit or attempt to commit theft.

6. The person who engages in certain conduct deliberately has upon consideration said to himself, "Let's do it." Still conduct committed "deliberately" need not be "premeditated." As explained in Black's Law Dictionary (Fourth Rev.Ed. 1968) at 1343:

"Premeditation differs essentially from *will* which constitutes the crime; because it sup-

poses, besides an *actual* will, a *deliberation* and a *continued persistence*." [Emphasis in original]

7. See Practice Commentary following V.T.C.A. Penal Code, § 30.02: "The requirement of a breaking ... or of force, threats, or fraud ... is also discarded."

Jumping over to ground of error forty six, as appellant finally says we should, we find his complaint that the evidence is insufficient to support the affirmative answer to special issue two that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. The problem we have with reviewing this ground of error is that it proceeds on the assumption that the State's evidence going to punishment has been excluded from consideration by our sustaining ten prior grounds attacking its admissibility. Yet, ruling out all or some of that evidence on the grounds advanced would recognize "trial error" and result in reversal and remand, just as has recently been done for much the same reasons in *Porter v. State*, 578 S.W.2d 742 (Tex.Cr.App.1979), erroneous admission at the punishment hearing of a file kept and maintained on the accused there by a federal parole officer pertaining to supervision progress of the former while on parole; [8] *Holloway v. State*, 613 S.W.2d 497 (Tex.Cr. App.1981), abuse of discretion to permit the opinion testimony of James P. Grigson, M.D., regarding future dangerousness of the accused.[9] Though we have addressed the problem, in the circumstances presented we can hardly resolve it. See *Collins v. State*, 602 S.W.2d 537 (Tex.Cr.App.1980). The last ground of error is overruled.

The grounds of error being without merit, appellant's motion for rehearing is denied.

McCORMICK, Judge, dissenting.

Since the judgment in this case does not require a reversal of the finding of guilt, Judge Roberts, Judge Dally and myself would reform the judgment to reflect a punishment of life imprisonment. See, generally, *Pierson v. State*, 614 S.W.2d 102 (1980) (On Motion for Rehearing, overruled without written opinion on April 29, 1981, McCormick, J. dissent, joined by Dally, J., joined in part by Roberts, J.); *Evans v. State*, 614 S.W.2d 414 (1980) (On Motion for Rehearing, overruled without written opinion on April 29, 1981, McCormick, J. concurrence joined by Dally, J.); *Loudres v. State*, 614 S.W.2d 407 (1980) (Roberts, J. dissent) (On Motion for Rehearing overruled without written opinion on April 29, 1981, McCormick, J. dissent joined by Dally, J.); *Grijalva v. State*, 614 S.W.2d 420 (1980) (Roberts, J. dissent) (On Motion for Rehearing, overruled without written opinion on April 29, 1981, Dally, J. dissent).

ROBERTS and DALLY, JJ., join in this dissent.

---

8. *Inter alia*, in reliance on *Porter v. State*, supra, appellant complains that erroneously admitted were certain prison records or testimony gleaned from them that reflected adversely on his conduct and revealed scores on a particular multiphasic examination earlier made while he was confined.

9. Spread upon the record in front of the jury was the fact that Dr. Grigson went to visit appellant but was hindered in conducting his now familiar examination by refusal of appellant to cooperate by exercising his right to remain silent during such interview——just now authoritatively recognized by the Supreme Court of the United States in *Estelle v. Smith*, —— U.S. ——, at ——, 101 S.Ct. 1866, at 1876, 68 L.Ed.2d 359 (1981). Thus thwarted, Grigson resorted to secondary sources, much as he did in *Holloway v. State*, supra. The State supports such gathering of data and information

by pointing to language regarding opinion of an educational expert in *Coffee v. William March Rice University*, 408 S.W.2d 269, 285 (Tex.Civ. App.—Houston 1966, ref'd n. r. e.) and noting that the Court recognized the "rule" in *Burrow v. State*, 481 S.W.2d 895, 898, n. 1 (Tex.Cr.App. 1972). Yet, in the text just above the Court quotes approvingly from another opinion in which a court was "unwilling to hold that the testimony of an expert witness, whose opinion is largely based on facts *actually known to him or proved to be true*, is automatically rendered valueless and inadmissible merely because in the course of his investigation he heard someone make a *casual hearsay statement* which *perhaps* had some *slight* part in the formation of his opinion." All concerned would do well to reexamine this matter carefully in light of *Estelle v. Smith*, supra, and *Holloway v. State*, supra.