Jeffery Dean MOTLEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 69452.

Court of Criminal Appeals of Texas, En Banc.

April 5, 1989.

Rehearing Denied May 24, 1989.

---

Stanley G. Schneider, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and James C. Brough & Ned Morris, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

Appellant was convicted of the offense of capital murder. Punishment was assessed at death.

In point of error number one appellant asks us to consider whether his right to a fair trial was abrogated by the prosecutor stating to jurors without objection from defense counsel that there is no difference between deliberate conduct and intentional conduct. In his second point of error, appellant argues that the State's burden of proof was lessened in violation of the Fifth Amendment to the United States Constitution when the prosecutor was allowed to qualify jurors on the basis that there was no difference between a deliberate killing and an intentional killing. We will consider these two points of error together.

Appellant contends first, that the effect of the voir dire examination, conducted by both the State and defense counsel was to prohibit the jury's individual consideration of evidence presented at the punishment stage in determining the answer to the first special issue. He further argues that if a juror unequivocally stated that he would answer the first special issue affirmatively after finding the defendant guilty of capital murder, in effect the juror would be challengable for cause under Article 35.-16(c)(2), V.A.C.C.P. Finally, he argues that impaneling a jury containing such jurors would, in effect, lessen the State's burden of proof necessary for it to inflict a death sentence.

Our review of the voir dire examination of the twelve actual jurors and one alternate juror chosen to sit in the case shows the jurors were not actually qualified on the definitions of "deliberate" and "intentional." Rather, it is clear from reading the record that both the prosecutor and the defense attorney felt that the crux of the case would be the jury's determination as to the second special issue. Consequently, in those situations where any discussion occurred with reference to the first special issue and the definition of the term "deliberately", it was a passing reference, with the prosecutor remarking that he personally did not see much difference between the terms. A representative example of the prosecutor's remarks occurred during the voir dire examination of prospective juror Gipson:

"Q. You will notice that special issue number one asks: Whether the conduct of the Defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.

You will notice on that that you have already, by the time you get to the punishment, you have already decided that he intentionally and knowingly killed Maria Curan or else you wouldn't be involved in punishment at all, you see.

So, it is our position, and you may or may not agree with it, that intentionally killing someone and deliberately killing someone is pretty much the same thing, or if there is a distinction, it is not much of a distinction.

"A. Right.

"Q. That's the one we call the easy issue usually. It may or may not be.

Counsel for the Defense may disagree entirely, may argue to the con-

trary, but generally, that's the one that doesn't give the jury as much concern."

Thus, during the voir dire examination of jurors Gipson, Thompkins, Butler, Portis, and Mehr and alternate juror Mumphord, the prosecutor stated that he personally saw little difference between "deliberate" and "intentional", so that if the jurors found during the first phase of the trial that the defendant acted "intentionally," there should be no question during the second phase of the trial that the first special issue—the one inquiring about "deliberateness"—could also be answered affirmatively. Defense counsel made no objection to these statements by the State and even agreed with the State's proposition during his voir dire examination of jurors Thompkins, Portis and Mehr. In the voir dire examination of five other jurors— Cagle, Long, Osmeyer, Grant and Prince—, the definitions of the terms were not discussed. Finally, juror Richard Roark, testified in response to questioning by the State that he saw a difference in the definitions of "intentional" and "deliberately."

At no time in the voir dire, did the prosecutor or the defense attorney extract from any of the jurors that they would automatically answer the first special issue affirmatively simply because they had already found him guilty of capital murder. Thus none of the jurors were excludable under Article 35.16(c)(2), supra, as appellant argues. Nor were the jurors instructed to disregard the evidence presented during the punishment phase of the trial in answering the first special issue. Based upon the record before us we are unable to say that the makeup of the jury was such that they would automatically answer special issue number one affirmatively and thus, in effect, lessen the State's burden of proof necessary for it to inflict a death sentence. Appellant first two points of error are overruled.

■ In his fourth point of error, appellant argues that Article 37.071(b)(1), V.A.C. C.P., violates the Fifth, Eighth and Fourteenth Amendments to the United States Constitution by not providing for a statutory definition of "deliberately" and thereby precludes the jury from considering mitigating circumstances. He argues that since the jury was told during voir dire that the terms "intentionally" and "deliberately" were synonymous, the jury, in answering special issue number one, did not consider any mitigating circumstances.

In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court dealt with the constitutionality of the Texas capital murder statutes with respect to the Eighth and Fourteenth Amendments. Noting that in order to meet the requirements of those amendments a capital murder sentencing system must allow the sentencing authority to consider mitigating circumstances, the Supreme Court focused on whether the special issues set out in Article 37.071(b), supra, allow consideration of particularized mitigating factors. Justice Stevens writing for the Court concentrated primarily on the second special issue dealing with the defendant's propensity for future violence. However, painting with a broad brush, he concluded that since the Texas system allows the defense to bring before the jury at the punishment phase of the trial whatever mitigating circumstances relating to the individual defendant can be adduced, the system is constitutional in that it "guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." 428 U.S. at 274, 96 S.Ct. at 2957, 49 L.Ed.2d at 939.

In *Brown v. State*, 554 S.W.2d 677 (Tex. Cr.App.1977), this Court specifically considered the constitutionality of the first special issue. In *Brown*, the defendant contended that the Texas death penalty statute was unconstitutional because Article 37.071(b)(1) and (3), supra, mandated the same finding as a finding of guilt under V.T.C.A., Penal Code, Section 19.03. This Court, relying on its prior opinion in *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975), held without elaboration that both the first and third special issues "serve the purpose of guiding the jury's punishment delibera-

tions and do not deny a defendant the right to an impartial jury in assessing punishment." 554 S.W.2d at 679. Judge Clinton in his dissenting opinion in *Russell v. State,* 665 S.W.2d 771 (Tex.Cr.App.1983) thoroughly discussed the first special issue. We quote that language now in pertinent part and adopt it now as part of this majority opinion.

"The Supreme Court [in *Jurek v. Texas*] made clear its understanding of the role of the second special issue, as construed by this Court, to be a focus on the 'particular circumstances' of the 'individual *offender*,' his character and propensities. The other prong of the constitutionally mandated sentencing inquiry— 'objective consideration of the particularized circumstances of the individual *offense*'—seems particularly well met by our first and third special statutory issues. Unlike the second special issue, the first and third focus the jury's attention upon historical facts surrounding commission of *the offense.* The first special issue, unlike the third, is submitted in all capital cases in which the accused is found guilty; it could be labeled a 'mitigating factor' since a negative jury finding thereon automatically operates to 'mitigate' the punishment to life. Conversely, the focus of the 'deliberateness' inquiry might be better characterized an 'aggravating circumstance' because an affirmative finding on it is a prerequisite to imposition of a sentence of death.

"Apparent, then, is the crucial function of the 'deliberateness question' in the Texas capital murder scheme: potentially the difference between life imprisonment and death. It follows that the jury's consideration of this question must be focused on the individual conduct of the defendant in the capital murder transaction and that the jury comprehend its meaning as distinct from other inquiries in the case. As the Supreme Court reiterated, *Furman's* [*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] 'basic requirement' is to 're-place[] arbitrary ... jury discretion with *objective* standards to guide, regularize, and make *rationally reviewable* the process for imposing a sentence of death.' *Woodson v. North Carolina,* 428 U.S.

280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976). Because of the qualitative difference between death and other punishments, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' *Woodson, supra,* at 305, 96 S.Ct. at 2991." *Russell v. State,* supra, at 786– 787. (emphasis in original) (footnotes omitted)

Also, see and compare *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

Furthermore, in *Clark v. State,* 665 S.W.2d 476 at 483 (Tex.Cr.App.1984), this Court set forth the test to be used when determining whether a criminal statute is unconstitutional for vagueness. The appellate court must scrutinize the statute to determine whether it is impermissibly vague as applied to the defendant's conduct. Applying this test to the instant case, we find nothing in the record to show that any of the jurors, in deciding on appellant's punishment, equated the term "deliberately" with the term "intentionally" and thus automatically answered the first special issue affirmatively without considering any mitigating factors. Second, there is nothing in the record to show that the appellant's acts were anything but deliberate. As such, we are unable to say that Article 37.071(b)(1), supra, was unconstitutional as applied to appellant.

In a related point of error, appellant argues that defense counsel was ineffective at trial. He lists four specific instances which he alleges show such ineffectiveness: (1) counsel's failure to object to the prosecutor's voir dire that there is no difference between intentional conduct and deliberate conduct; (2) counsel's qualifying prospective jurors by saying "Now issue one. I agree with practically everyone. I don't see much difference between deliberately and intentionally. They both look to me like they are about the same. We can skip that."; (3) counsel's arguing to the jury that it had only one question to answer at punishment; and (4) counsel's failure to investigate and familiarize himself with

Texas law applicable to capital murder prosecutions.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court set out a two part test which should be applied in determining whether counsel was ineffective in his assistance at trial. The *Strickland* test requires the accused to show first, that counsel's representation was deficient or in other words, that counsel's performance was not reasonably effective; and second, the accused must show that this deficient performance prejudiced the defense. *Duncan v. State,* 717 S.W.2d 345 (Tex.Cr.App.1986). In other words, once counsel's performance has been deemed deficient, it must also be shown that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Ingham v. State,* 679 S.W.2d 503 (Tex.Cr. App.1984). Inherent throughout the opinion in *Strickland* is that there is a presumption that counsel rendered reasonable professional assistance. *Duncan v. State,* supra.

Evidence at trial showed that the 30 year old victim was last seen on the morning of July 22, 1984, as she prepared to drive to a friend's apartment to go swimming. When the victim failed to arrive, the friend called the victim's family. Police were called in to investigate. Appellant was arrested on July 29, 1984, after he was found in possession of the victim's car. Found inside the car was a sawed off shotgun and a number of shotgun shells. The victim's credit cards, driver's license and social security card were found in a dumpster near the apartment complex where appellant was arrested. Traces of human blood were found on the spare tire in the trunk of the car and on one of the tennis shoes appellant was wearing when he was arrested. In addition, a review of a video tape taken by a camera at an automatic teller machine, showed that the victim made two withdrawals totaling $300.00 on the morning of July 22, 1984, while in the company of appellant. The victim's body was found in a field on August 1, 1984. Her shorts had been removed, and her swimming suit which she had been wearing underneath her shorts and T-shirt had been cut away at the crotch. Cause of death was a shotgun wound to the back. Testimony from a firearms examiner from the Houston police department showed that the shotgun had probably been fired from a distance of at least thirty-five to forty-five feet. Due to the decomposition of the body, the medical examiner was unable to determine if the victim had been raped.

At the punishment phase of the trial, five State's witnesses testified that appellant's reputation in the community for being peaceful and law-abiding was bad. Another witness testified that appellant had been arrested in November of 1982 for unlawfully carrying a weapon. A pen packet introduced into evidence showed that in March of 1983, appellant had been convicted of burglary of a habitation with intent to commit theft and was sentenced to five years. Then in June of 1983, appellant had been convicted of burglary of a motor vehicle and sentenced to two years. These sentences were ordered to run concurrently. Finally, a fifteen year old runaway testified that in July of 1984, she had attended a party at which appellant was present. During the party she became intoxicated and appellant and several other males had sexual intercourse with her. She specifically remembered appellant because he attempted to have anal intercourse with her and it was very painful.

The appellant began his evidence at the punishment stage of the trial by having eight of his relatives, including his mother and his father, take the stand and ask the jury for mercy. None of these witnesses was asked about the probability of appellant commiting future acts of violence. Evidence of long time abuse of appellant by his parents came from appellant himself and Margaret and Douglas Howell, long time neighbors of appellant's parents. The Howells testified that due to the abuse, appellant frequently ran away from home and often came to their home to sleep and eat. Appellant related that he had been both physically and sexually abused by his father. Finally, Dr. Fred Fason, a psychia-

trist, testified about the adverse effects of abuse upon children.

During the punishment phase of the trial, the prosecutor made the following argument with respect to the first special issue:

"The first issue is: Whether or not this was a deliberate act.

"I told you, when we discussed with each of you, when you were down the hall there, when we were selecting the jury, that there may not be too much difference between an intentional act and a deliberate act. You see, the law wants to make sure that it is deliberate as well as intentional, if there is any distinction at all, and I submit to you, ladies and gentlemen, when you take this Ted Williams, .12 gauge shotgun, from thirty-five feet away from me the back of that room, and you fire that shotgun into a fellow human being, with a .12 gauge projectile in it, that you're firing, in essence, a small cannon into that person, and you're causing that shot to go into that person, and to destroy that person's internal organs as a shotgun will. The shot goes all the way through that person and it kills that person.

.    .    .    .    .

"I submit to you, ladies and gentlemen, that is a deliberate act. There is no getting around it, especially by a person that has just sawed that barrel off that shotgun in preparation for all of this.

"I submit to you, ladies and gentlemen, that the answer to special issue number one: Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result, there is only one possible answer for that question, ladies and gentlemen, that it was a deliberate act and it was deliberate on the part of Jeffery Motley, and it was deliberate and intentional, as you found it."

The remainder of the prosecutor's argument was devoted to the second special issue. Defense counsel agreed that the main issue in the case was the second special issue:

"Each and every one of you were questioned about what you would need to answer issue number two, and that's what it's all about today, your answer to issue number two."

Questions concerning the definitions of "deliberately" and "intentionally" have been before this Court time and time again. In *Esquivel v. State*, 595 S.W.2d 516 (Tex. Cr.App.1980), we held that the trial court did not abuse its discretion in refusing to allow defense counsel to interrogate prospective jurors relative to their understanding of the term "deliberately." See also *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978). We have repeatedly held that the term "deliberately" need not be defined in the jury charge, but rather jurors should be left to give the term its common usage. *Cordova v. State*, 698 S.W.2d 107 (Tex.Cr.App.1985); *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985); *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr. App.1984); *Morin v. State*, 682 S.W.2d 265 (Tex.Cr.App.1983); *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983); *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983); *King v. State*, 553 S.W.2d 105 (Tex.Cr.App. 1977). We have decided that "deliberately," as used in the first special issue is not the linguistic equivalent of "intentionally," as used in the charge on guilt-innocence. *Stewart v. State*, supra; *Fearance v. State*, 620 S.W.2d 577 (Tex.Cr.App.1981) (Opinion on Rehearing); *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981). In *Fearance*, this Court went so far as to define "deliberately" as the "thought process which embraces more than a will to engage in conduct and activates the intentional conduct" but noted that conduct committed "deliberately" need not be premeditated. 620 S.W.2d at 584. See also *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App. 1976). In *Cannon v. State*, supra, we stated that to find the act of deliberateness, there must be "the moment of deliberation and the determination on the part of the actor to kill." 691 S.W.2d at 677.

Cases in which we have specifically held conduct to be deliberate include: *Goodman v. State*, 701 S.W.2d 850 (Tex.Cr.App.1985),

(where defendant without warning or provocation shot and killed victim who was standing beside a van talking to a woman inside the van); *Cordova v. State,* supra (where defendant and companions assaulted the unarmed victim and his girlfriend and defendant beat victim in the head and face with a tire iron and defendant's companion stabbed victim with a knife); *Cannon v. State,* supra (where the defendant shot the victim seven times with a revolver which could only be fired after it had been cocked and during the shooting the victim was repeatedly begging the defendant not to kill her and was attempting to escape); *Green v. State,* supra (where defendant, while willingly participating in a planned burglary, entered the house while holding a loaded gun and told a coparticipant to shoot the victim); *Selvage v. State,* 680 S.W.2d 17 (Tex.Cr.App.1984), (where although defendant did not shoot victim evidence showed that he used lethal force to effectuate a safe escape by attempting to kill individuals who pursued him and his companion from the scene of the robbery-murder); *Smith v. State,* 676 S.W.2d 379 (Tex.Cr.App.1984), (where defendant and accomplice, after arming themselves and loading their weapons, entered store with intent to commit robbery and during the robbery defendant mortally wounded the victim); *Russell v. State,* supra (where the defendant and cohort kidnapped and robbed the victim and later killed him by stabbing him numerous times (one stab wound being in the jugular vein) and by crushing his skull with a piece of concrete); *Fearance v. State,* supra (where defendant after initially stabbing the victim in the abdomen, turned and stabbed the victim's husband numerous times in the back, and then returned to the victim and stabbed her twice more in the back); *Duffy v. State,* 567 S.W.2d 197 (Tex.Cr.App.1978) (where defendant stabbed eighty year old woman ten times with such force that several of her ribs were fractured); *Granviel v. State,* supra (where defendant stabbed the bound and gagged two year old victim nine times); *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976) (where during holdup of grocery store, defendant's accomplice, at defendant's direction, shot the clerk after defendant attempted to shoot the clerk and his gun misfired).

■ At the hearing on the motion for new trial, evidence showed that defense counsel prior to trial had an opportunity to view the entire State's file prior to trial. Knowing the State's case and the facts evolved from the investigation of the crime, it was plausible for defense counsel to feel that the jury would probably have little trouble in determining appellant's "deliberateness", once they found him guilty of the crime. Clearly the facts of the instant case when compared with the cases set out above easily allow a finding of "deliberateness." Thus, it was defense counsel's attitude that the only way of saving appellant from the death penalty was to try and win on the second special issue—dealing with probability of future violence. Accordingly, that is how appellant's defense was geared. All of the evidence he presented at the punishment stage of the trial went to the proposition that appellant had been abused both physically and sexually as a child and as a result of that abuse, he acted out. However with proper therapy, appellant would not be violent in the future. Clearly this was a strategy on the part of defense counsel. As such, there was no reason to either object to the prosecution's characterization of "intentional" and "deliberate" as being similar, nor was there any error when defense counsel himself stated that he himself did not see much difference in the terms. Likewise, we find no error in counsel's arguing to the jury that it had only one question to answer at punishment. Thus as to appellant's first three allegations concerning ineffective assistance of counsel, we find that under the first prong of *Strickland* counsel's performance was not deficient.

In his last allegation under this point of error, appellant argues that counsel was ineffective in that he failed to investigate and familiarize himself with Texas law applicable to capital murder prosecutions. Specifically appellant alludes to

"a voir dire that neglected his defense. A defense that neglected numerous re-

ferrals to child welfare based upon him being an abused child. A defense that did not include evidence of an organic brain disorder that was readily discoverable. A voir dire that authorized a jury to answer affirmatively one of the special issues based upon its verdict at guilt/innocence without consideration of mitigating factors. A voir dire that stated that deliberate conduct and intentional conduct were one in the same, followed by the Defenses' assertion in his final argument that: 'You have only one question to answer and that is: Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society'."

At the hearing on appellant's motion for new trial, the defense presented evidence from several school officials who testified that although they had known appellant as an elementary school student and were familiar with his background, they had not been contacted by either trial counsel or his investigator in regards to the instant case. These witnesses testified that as a child, appellant was emotionally disturbed, had a lot of inner conflict feelings relating to his father, had difficulty getting along with other children, was highly distractable, had been placed in Special Education classes because of his problems and had undergone neurological evaluation. This neurological evaluation had resulted in a diagnosis of "neurological organic involvement." Louis Giusti, an elementary school principal in the Deer Park Independent School District who was also certified as a Special Education counselor, testified that this indicated that appellant had a neurological impairment somewhere in the central nervous system. Giusti also testified that he felt the basis of appellant's emotional problems as a child was the lack of tender loving care in his home environment. The defense also presented testimony from several of appellant's childhood neighbors who testified that they would have testified at trial if called upon. All of these neighbors testified that appellant was abused as a child and they did not think he would be violent in the future. One of these wit-

nesses, Ann Cochran, testified that she had called child welfare on four occasions concerning appellant because he was abused by his parents. All testified that either they had not been contacted by appellant's trial attorney or else their testimony at the trial was severely restricted by the trial attorney. Appellant's father and mother testified that they had minimal contact with the trial attorney during the course of the trial. Bobby McClelland, a friend of appellant's testified that he told the trial attorney that the Saturday before appellant was arrested, appellant gave him a ride in the victim's car and he (McClelland) had left his knife in the car. Appellant was high that night and when McClelland first saw him, appellant was in the process of stealing some stereo speakers out of a car. On cross-examination, the State established that McClelland had two prior felony convictions.

Appellant's trial counsel testified that he had been licensed for thirty-five years, concentrating primarily in criminal law. During his career, he had tried eight capital murder cases. Counsel related that after he was appointed to represent appellant, he met with appellant and appellant gave him the names of several potential witnesses. Counsel related that his investigator talked with Bobby McClelland, but they decided not to use him after McClelland informed the investigator that appellant had been calling him from jail and urging McClelland to lie and say that he had seen appellant with the victim the night before the offense. Counsel testified that he did not want to put a witness on the stand who would commit perjury so he did not call McClelland as a witness.

Counsel also testified that because he had complete access to the State's file prior to trial, he knew that the State had information that appellant had been involved in several assaults, sexual assaults, thefts and burglaries. Therefore when he put appellant's relatives on during the punishment stage of the trial, he did not ask them any reputation questions concerning appellant for fear of opening the door to the State's "have you heard" questions con-

cerning appellant's criminal record. Counsel also testified that he purposely did not spend a lot of time with appellant's parents because his strategy during the punishment phase of the trial was to put the blame for appellant's actions on the physical and sexual abuse inflicted on appellant by his father. Counsel testified that during the trial appellant told him he was pleased with his representation and in fact signed a form to that effect. Although the form was admitted into evidence, we are unable to find it in the trial record. However, it is apparent from the record of the hearing on the motion for new trial that the form contains a blank for the defendant to list any additional witnesses he wishes to be called in his defense and a blank for any other suggestions. The testimony indicates that appellant did not fill in either one of these blanks. Finally, testimony showed that appellant had indicated on the form that he wanted to testify.

With respect to the specific allegations in his brief, our review of the case shows that counsel's voir dire examination of the jury was not deficient. The crux of the case was not appellant's "deliberateness" at the time of the offense. Rather it was appellant's propensity for violence. This was the area in which counsel concentrated his voir dire examination and his presentation of evidence at the punishment phase of the trial. And although counsel did not present evidence relating to specific investigations into appellant's abuse by child welfare, he did present evidence that such abuse had occurred and then by means of expert testimony, presented evidence outlining the effects of such abuse upon a child. The fact that other counsel might have tried the case differently does not show ineffective representation. Considering the totality of the representation, we find that counsel's performance was not deficient and did not fall below an objective standard of reasonableness. Therefore appellant has not satisfied the first prong of *Strickland,* and our inquiry need not go any further. Appellant's third point of error is overruled.

In his seventh point of error, appellant argues that his attorney was ineffective

when he failed to advise appellant that appellant's oral statements could be used for impeachment purposes when appellant testified. In reply, the State correctly points out that appellant cites no place in the record which shows that appellant's attorney did not inform appellant that his oral statements to the officers could be used for impeachment if he testified. Although a hearing was held on appellant's motion for new trial which alleged ineffective assistance of counsel, this subject was never broached. The record does not support appellant's factual allegation. This point of error is overruled.

Appellant's next two points of error deal with the prosecutor's jury argument. During the punishment phase of the trial the prosecutor made the following argument:

"Ladies and gentlemen, you are back here in a comfortable room here, the way it should be. I wish you were up on top of the Shell Building, some tower here in town, where you could look out over the two million people that you represent, and you could see all these little homes where people are working hard, trying to make a living and trying to get by and raise their kids in safety. In all of these homes, there are a lot of veterans that have suffered a great deal so that we can be secure in our homes; so that we can be free from this violence; so we won't have to have killers preying on us and roaming our streets. Anytime that they get the price of a shotgun shell, they can go hunting.

"Ladies and gentlemen, the only answer to special issue number two should be yes, and for those two million people out there that would be in your view, should you be up on this tower, for those two million people that are depending on juries down here to answer these questions honestly and fairly to insure their safety, the answer is that there is a probability that Jeffrey Motley would commit criminal acts of violence that would constitute a continuing threat to society."

Appellant now argues that reversible error was committed when the prosecutor

told the jury that they represented and spoke for the community which wanted them to assess a death sentence for appellant. He would have us construe the prosecutor's argument as saying that the community was calling for a specific result in this case.

We find that this point of error must be overruled for two reasons. First, there was no objection to this argument. Unless the argument of the prosecutor is so prejudicial that no instruction could cure the harm, the failure to timely object waives any error. *Green v. State,* 682 S.W.2d 271 (Tex.Cr.App.1984); *Curtis v. State,* 640 S.W.2d 615 (Tex.Cr.App.1982); *Hawkins v. State,* 628 S.W.2d 71 (Tex.Cr.App.1982).

■ Second, the prosecutor's argument was not error. Jury argument by a prosecuting attorney that is designed to induce the jury to convict the defendant or assess him a particular punishment because "the people" or "the community" desire such is improper jury argument. Arguments made in such a fashion do not fall with in the areas of argument approved in *Alejandro v. State,* 493 S.W.2d 230 (Tex. Cr.App.1973) and have the practical effect of injecting a new and harmful fact into evidence. *Cortez v. State,* 683 S.W.2d 419 (Tex.Cr.App.1984). Thus when an argument is made that asks the jury to convict or punish the defendant upon public sentiment or desire rather than upon the evidence that has been received during the trial, error is committed. *Cortez v. State,* supra; *Prado v. State,* 626 S.W.2d 775 (Tex.Cr.App.1982); *Pennington v. State,* 345 S.W.2d 527 (Tex.Cr.App.1961); *Cox v. State,* 157 Tex.Cr.R. 134, 247 S.W.2d 262 (1952); *Porter v. State,* 154 Tex.Cr.R. 252, 226 S.W.2d 435 (1950). The argument set out above does not fall within this impermissible category of argument. Here there was no demand for a specific result based upon community sentiment. The prosecutor was asking the jury to be honest and fair in answering the special issues because that was what the community demanded. Clearly this was an argument for law enforcement. Consequently it fell within the parameters of acceptable jury argument. *Alejandro v. State,* supra. Appellant's fifth point of error is overruled.

■ Next, appellant complains of the following argument:

"Ladies and gentlemen, this case calls for only one verdict, one verdict, not murder. Please don't be led down that path. That's a loss for Maria Duran. That's a loss for the State, and that is a loss for the people that you represent, because the law provides that a person that commits capital murder, if he commits murder and he intentionally commits the murder in the course of committing or attempting to commit a robbery, and that can be before, during, after a flight or whatever you call it. The flight doesn't mean you have to be running. He is still carrying this evil scheme out, until he drove away from her body that night.

"We don't know how many times he went back out to see that body. We don't know when he put that body out there. We don't know whether or not he wanted to visit that warm body one more time as she lay there dead, to bring that blood back to Catfish. We don't know what ugly story, how deep this ugly story goes, but we know it is ugly and we know it is capital murder, and it was committed during the course of a robbery, and nothing less.

"We submit to you, ladies and gentlemen, in behalf of the people that you represent in this community, a finding of any less than capital murder for Jeffery Motley, the author of this murder, is zero. It is capital murder. We are asking for a capital murder conviction."

No objection was made to the argument.

Appellant argues that the prosecutor's argument that the jury represented the community denied him a fair trial. He argues that this argument is no different than the argument condemned in *Bothwell v. State,* 500 S.W.2d 128 (Tex.Cr.App.1973).

Initially, we note as we did in the previous point of error that no error was preserved. *Green v. State, supra; Curtis v. State,* supra; *Hawkins v. State,* supra.

Second, we find that the argument was not error. In *Bothwell*, the case upon which appellant relies, the prosecutor made the following argument:

"Helen Bothwell, I mean, you can look at him and you can sit here in court and you can empathize with him and say, Oh, here sits somebody, you know, here's another person sitting here in court. I've looked at him throughout the course of the trial. We, of course, who we represent, as I told you yesterday, a million two hundred thousand people living in this county, we can't fit them all into court. We can't have you sympathize with our side. You can't see Helen Bothwell—" 500 S.W.2d at 130.

Appellant has misread *Bothwell*, because rather than condemning the above argument, this Court held that these comments did not constitute reversible error. The Court wrote that this argument was not the kind of argument which suggested that the community demanded a certain result such as was found in *Pennington v. State*, supra; *Cox v. State*, supra; and *Porter v. State*, 154 Tex.Cr.R. 252, 226 S.W.2d 435 (1950).

We agree that the complained of argument in the instant case is much like the argument in *Bothwell*. Neither of the arguments expressed the thought that the community demanded a certain result. Compare and contrast *Pennington v. State*, supra, (in which the prosecutor argued, "The people of Nueces County expect you to put this man away.") and *Cox v. State*, supra, (in which the prosecutor argued, "The people of DeSoto are asking the jury to convict this man.") We find no reversible error. *Ridyolph v. State*, 545 S.W.2d 784 (Tex.Cr.App.1977). This point of error is overruled.

■ Finally, appellant argues that the admission into evidence of an unadjudicated act of misconduct, specifically the rape of the fifteen year old runaway, denied him equal protection of the laws as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, since such evidence would have been inadmissible in a trial for a noncapital offense. Ap-

pellant acknowledges our prior holdings with respect to this contention and urges this Court to overrule these holdings.

In recent years we have been given countless opportunities to review this question. In every case, this Court has continued to adhere to the holding that admission of such evidence does not deny the capital murder defendant of equal protection. *Hogue v. State*, 711 S.W.2d 9 (Tex.Cr.App. 1986); *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985); *Morin v. State*, 682 S.W.2d 265 (Tex.Cr.App.1983); *Williams v. State*, 622 S.W.2d 116 (Tex.Cr.App.1981). We have nothing before us which persuades us to hold otherwise in the instant case. Consequently we will overrule this point of error. Appellant's eighth point of error is overruled.

The judgment is affirmed.

CLINTON and CAMPBELL, JJ., concur in the result.

TEAGUE, J., dissents.