IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-2610
_____

JEFFREY DEAN MOTLEY,

Petitioner-Appellant,

v.

JAMES A. COLLINS, Director,
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

(September 21, 1993)

Before KING, DAVIS and WIENER, Circuit Judges.

KING, Circuit Judge:

Jeffrey Dean Motley, a Texas death row inmate convicted of capital murder, appeals from the district court's decision denying his petition for a writ of habeas corpus. For the reasons discussed below, we conclude that this case fits squarely within the small class of cases still controlled by Penry: the jurors who sentenced Motley to death were unable, as required by the Eighth and Fourteenth Amendments, to consider and give effect to the substantial mitigating evidence that Motley was abused as a child. Accordingly, we reverse the district court's decision denying the writ.

## I.  BACKGROUND

On the morning of July 22, 1984, Maria Duran left her home to drive to a friend's apartment to go swimming.  She never arrived.  Duran's family called the police, who began investigating her disappearance.

Seven days later, on July 29, 1984, the police arrested Jeffrey Motley as he was driving Duran's car.  A search of the car uncovered a sawed-off shotgun, a number of shotgun shells, and a hunting knife.  Police also discovered traces of human blood on the spare tire in the trunk of Duran's car and on one of the tennis shoes that Motley was wearing.  Duran's credit cards, driver's license, and social security card were found in a trash bin near the apartment complex where Motley was arrested.

On August 1, 1984, three days after Motley's arrest, police found Duran's body in a field.  There were some signs that Duran had been sexually assaulted,[1] but the evidence was ultimately found to be inconclusive.  The cause of death, according to the medical examiner, was a gunshot wound in the back.  Investigators could not determine, however, whether the shotgun slug that killed Duran was fired from the shotgun found in Duran's car.

Based on the evidence found in Duran's car at the time Motley was arrested, as well as other circumstantial evidence linking Motley to the crime, the jury convicted Motley of capital murder.  After hearing evidence on issues relevant to sentencing,

---

[1] Specifically, there was evidence that Duran's shorts had been removed and that her swimsuit had been cut away at the crotch.

including evidence that Motley was physically and sexually abused as a child, the jury was presented with two of the three Texas special issues:

> (1) Was the conduct of the Defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased would result?
>
> (2) Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

See TEX. CODE CRIM. PROC. ANN. art. 37.071(b) (Vernon 1989). The jury answered both of these questions affirmatively and, as a result, Motley was automatically sentenced to death.

Motley's conviction and sentence were affirmed on direct appeal. See Motley v. State, 773 S.W.2d 283 (Tex. Crim. App. 1989). The Texas Court of Criminal Appeals denied rehearing on May 24, 1989. Because Motley did not petition the Supreme Court for writ of certiorari, his conviction became final ninety days later--about two months after the Supreme Court issued its opinion in Penry v. Lynaugh, 492 U.S. 302 (1989). Thereafter, Motley filed a petition for habeas corpus in state court, which was denied on July 22, 1992. See Ex Parte Motley, No. 23806 (Tex. Crim. App. 1992). Motley then proceeded to federal district court, where the judge denied habeas relief on all of his claims. This appeal followed.

3

## II. ANALYSIS

Motley raises two arguments on appeal.  He argues, first, that the district court erred in rejecting his ineffective assistance of counsel claim.  Motley also contends that the district court erred in rejecting his Penry claim--i.e., his claim that the jury was unconstitutionally prevented from considering and giving effect to evidence that he was abused as a child.  We address each of these arguments in turn.

### A.   **Ineffective Assistance of Counsel Claim**

In district court, Motley argued that his trial counsel rendered ineffective assistance of counsel by committing errors at various stages of his capital murder trial.  Among other things, Motley argued that his counsel rendered ineffective assistance by:  (a) agreeing with the State, during voir dire, that the term "deliberately" under the first special issue means essentially the same thing as "intentionally" in the guilt/ innocence phase of the trial; (b) calling Motley as a witness after the State rested with evidence that, according to Motley, was insufficient to support a conviction; (c) being generally unfamiliar with capital sentencing law--particularly, the admissibility of unadjudicated extraneous offenses; and (d) failing to investigate and introduce evidence of Motley's brain damage during the punishment phase of the trial.

The district court rejected Motley's ineffective assistance of counsel claim.  It first reasoned, "The state court found that Motley received effective assistance at all phases of his trial.

4

Because the record supports those factual findings, they are presumed correct." The district court further reasoned, with respect to each of the alleged errors, that they either represented valid strategic choices by Motley's trial counsel or did not prejudice his defense.

As explained below, the district court correctly rejected Motley's ineffective assistance of counsel claim. Although we disagree with the district court's assertion that the state court's finding of effective assistance is entitled to a presumption of correctness as a factual finding under 28 U.S.C. § 2254(d), we agree that on this record Motley has failed to show how the alleged errors prejudiced the outcome of either the guilt/innocence or punishment phase of his trial.

1.   *The Strickland Framework*

The standard for assessing whether counsel rendered constitutionally ineffective assistance, which was set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), is a familiar one. To obtain relief, a criminal defendant must first demonstrate that counsel's performance was deficient. The defendant must also demonstrate that counsel's deficient performance prejudiced the defense. Id. at 687; United States v. Smith, 915 F.2d 959, 963 (5th Cir. 1990).

The proper standard for measuring counsel's performance under the first prong of Strickland is reasonably effective assistance. That is, "the defendant must show that counsel's representation fell below an objective standard of

5

reasonableness."  Strickland, 466 U.S. at  687-88.  Our scrutiny of counsel's performance must be "highly deferential," and we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Id. at 689.  Under Strickland, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id.

To satisfy the prejudice prong of Strickland, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The defendant need not show that "counsel's deficient conduct more likely than not altered the outcome in the case."  Id. at 693.  But it is not enough, under Strickland, "that the errors had some conceivable effect on the outcome of the proceeding."  Id.

In reviewing ineffective assistance claims raised on habeas corpus, we do not, contrary to the district court's assertion otherwise, defer to a state court's conclusion that counsel rendered constitutionally effective assistance.  As Justice O'Connor has stated:

> Ineffectiveness is not a question of "basic, primary, or historical fac[t]," Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963).  Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact.

466 U.S. at 698. And, "[a]lthough state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." Id.[2]

Finally, in deciding ineffectiveness claims, we need not address both prongs of the Strickland test. If we can "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Id. at 697. We therefore proceed in such a fashion.

2. *Assessing Motley's Claim Under the Strickland Framework*

The alleged errors to which Motley points are not sufficient, either alone or in combination, to render his trial counsel's performance constitutionally ineffective. While Motley's trial counsel may have been deficient in certain respects, this deficient performance did not, in our view, prejudice the outcome of either the guilt/innocence or the sentencing phase of Motley's trial. We therefore affirm the district court's decision to the extent that it denied relief on this ground.

---

[2] We note that this is not the first time this district court judge has erroneously suggested that a state court's finding of effective assistance is entitled to deference as a factual finding under § 2254(d). See, e.g., Black v. Collins, 962 F.2d 394, 401 (5th Cir.) ("Contrary to what the federal district court appears to have thought, a state court's ultimate conclusion that counsel rendered effective assistance is not a fact finding to which a federal court must grant a presumption of correctness under 28 U.S.C. § 2254(d)."), cert. denied, 112 S. Ct. 2938 (1992).

First, Motley complains about his trial counsel's failure to correct the State's assertion during voir dire that the term "deliberately," as used in the first Texas special issue, was substantially equivalent in meaning to the term "intentionally." Motley correctly points out that the Texas Court of Criminal Appeals has refused to equate the two terms. See Motley v. State, 773 S.W.2d at 289 ("We have decided that `deliberately,' as used in the first special issue is not the linguistic equivalent of `intentionally,' as used in the charge on guilt-innocence."); Heckert v. State, 612 S.W.2d 549, 553 (Tex. Crim. App. 1981) (presuming that Texas legislature did not intend "for finding of deliberateness to be based upon the same standard as that of intentional or knowing"). But this observation establishes, at most, that Motley's trial counsel was deficient. Motley has not satisfactorily demonstrated a reasonable probability that, had his trial counsel corrected any misapprehension on the part of jurors during voir dire, the result of the sentencing proceeding would have been different. Specifically, he has not shown how a more favorable definition of "deliberately" would have caused at least one juror[3] to return a negative answer to the first special issue. See Landry v.

---

[3] Under the Texas capital sentencing scheme in existence at the time of Motley's trial, if jurors became deadlocked on any of the special issues--i.e., they could not get twelve "yes" votes or ten "no" votes--the court was required to sentence the defendant to life imprisonment. See TEX. CODE CRIM. PROC. ANN. art. 37.071(e) (Vernon Supp. 1990) (subsection (e) amended in 1981).

<u>Lynaugh</u>, 844 F.2d 1117, 1120 (5th Cir.), <u>cert. denied</u>, 488 U.S. at 900 (1988).

Motley also argues that his trial counsel, instead of calling him to the stand, should have rested after the State put on its case in chief. He contends that, if he had not been called to testify, and if the State had not impeached him with a statement in which he admitted killing Duran, there would have been insufficient evidence upon which to convict him. We disagree. Motley has not demonstrated a reasonable probability that, if he had not testified, (1) the jury would not have convicted him of capital murder, or (2) his conviction would have been reversed on the basis of insufficient evidence. In short, we find that the State introduced ample evidence during its case in chief to support a guilty verdict. Thus, Motley fails to satisfy <u>Strickland</u>'s prejudice requirement.

Motley has also failed to demonstrate prejudice resulting from his trial counsel's alleged unfamiliarity with capital sentencing law. Motley complains specifically that his trial counsel "did not understand the admissibility of unadjudicated offenses at the punishment stage of a capital murder trial." Yet he concedes that the Texas Court of Criminal Appeals has "long held" that unadjudicated offenses are admissible at the punishment phase of a capital murder trial. <u>See</u> <u>Kinnamon v. State</u>, 791 S.W.2d 84, 93 (Tex. Crim. App. 1990) (citing numerous cases). Although the Supreme Court has not considered the

9

question,[4] we have also sanctioned the practice of admitting unadjudicated offenses during the punishment phase of trial. See Landry v. Lynaugh, 844 F.2d at 1121 (rejecting, albeit with reservations, a due process challenge to the practice); Williams v. Lynaugh, 814 F.2d 205, 208 (5th Cir.) (rejecting an equal protection challenge to practice), cert. denied, 484 U.S. 935 (1987). Motley has thus not alleged how his trial counsel's unfamiliarity with the law on unadjudicated extraneous offenses resulted in the admission of any evidence that should have, or would have, been excluded.

Finally, Motley complains about his trial counsel's failure to develop mitigating evidence concerning his organic brain damage. Had Motley's trial counsel not pursued a strategy of introducing evidence of Motley's child abuse, we might well agree that the failure to introduce evidence of his brain damage would have been a reasonable strategic decision; after all, such evidence may have been "double-edged"--in that it may have militated in favor of a "yes" answer to the future dangerousness special issue. Given the strategic choice of Motley's trial counsel to present evidence of physical and sexual abuse, see Motley v. State, 773 S.W.2d at 290, however, it may have been

---

[4] See Williams v. Lynaugh, 484 U.S. 935 (1987) (Marshall, J., joined by Brennan, J., dissenting from denial of certiorari) (arguing that practice of admitting unadjudicated extraneous offenses at capital sentencing proceeding "presents a serious constitutional issue"); see also Steven Paul Smith, Note, Unreliable and Prejudicial: The Use of Extraneous Unadjudicated Offenses in the Penalty Phases of Capital Trials, 93 COL. L. REV. 1249 (1993) (criticizing the practice as injecting unreliability into the sentencing process).

unreasonable for him to ignore evidence of neurological damage and other evidence that would have been in the same vein as the evidence actually introduced at the punishment phase.

In any event, Motley has not satisfied the prejudice prong of Strickland. Much of the non-record Penry evidence merely corroborated the substantial trial testimony that Motley was abused as a child, and thus would have been cumulative of the evidence actually introduced. More important, the evidence of organic brain damage was relatively weak: a doctor who examined Motley as a child concluded that he had "neurological soft signs" and diagnosed him as having "neurological organic involvement." In short, we find no reasonable probability that this additional mitigating evidence would have tipped the scales in favor of a life sentence. See Duhamel v. Collins, 955 F.2d 962, 966 (5th Cir. 1992).

B.  **Penry Claim**

Motley also raised a Penry claim in district court. That is, he argued that the Texas special issues effectively prevented the jury from considering and giving effect to the substantial evidence of his child abuse. He claimed that, under the Eighth and Fourteenth Amendments, as interpreted in Penry v. Lynaugh, 492 U.S. 302 (1989), he was entitled to habeas relief.

The district court summarily rejected Motley's Penry claim. It concluded that, because Motley failed to object to the special issues on Penry grounds, he procedurally defaulted his claim.

11

The district court alternatively reached the merits of Motley's

Penry claim, but only to hold that it was frivolous:

> Motley's argument is simple and wrong. [He argues that] [h]is circumstances were pitiful as a child; therefore, he is not responsible for his acts. Freedom necessarily implies responsibility; Motley abused his freedom. He must bear the consequences the state of Texas has prescribed for this particular abuse, after he has been afforded every protection the procedures of a humane, reasonable people can offer.
> Child abuse is tragic for anyone, but its ability to break the causal connection between the free will of the defendant and the fate of his victim has never been suggested. If a defendant could argue that this experience as a youthful victim of abuse led him to react excessively to his perception of a threat, he could lend some support to an otherwise implausible assertion of self defense. These sorts of considerations were not present in this case.
> Motley argues that his experience as a victim of abuse in part justified his murdering an innocent passer-by . . . ; this is not a constitutional issue. Motley's position is an insult to people everywhere who have overcome their injuries and deprivations to become successful contributing members of our community. Also, murders are committed by people who were not abused, contradicting the causal inference Motley wants the court to make.

The district court's analysis of Motley's Penry claim is flawed in several respects. Initially, it reflects a misunderstanding of Texas cases concerning the procedural default of Penry claims. Also, the district court's analysis confuses the definition of mitigating evidence, a term that is only relevant to the question of punishment, with the definition of justification or excuse, concepts that are relevant to a criminal defendant's guilt or innocence. Most importantly, however, the district court ignores that the Supreme Court's decision in Penry squarely controls the outcome in this case.

12

    1.    *The Penry Framework*

        a.    The Supreme Court's Decision in Penry

    In Penry v. Lynaugh, the Supreme Court reaffirmed the Eighth
Amendment principle that "punishment should be directly related
to the personal culpability of the criminal defendant."  492 U.S.
at 319.  This culpability principle, which was first articulated
by a plurality of the Court in Lockett v. Ohio, 438 U.S. 586
(1978), and later embraced by a majority in Eddings v. Oklahoma,
455 U.S. 104 (1982), places special constraints on states in
meting out the death penalty.  Under this principle a State
cannot, "consistent with the Eighth and Fourteenth Amendments,
prevent the sentencer from considering and giving effect to
evidence relevant to the defendant's background or character or
to the circumstances of the offense that mitigate against
imposing the death penalty."  Penry, 492 U.S. at 318.

    In Penry, the Court held that Texas' capital sentencing
statute may, in some circumstances, violate the culpability
principle embodied in the Eighth and Fourteenth Amendments.  The
Court vacated Penry's death sentence because it found that the
Texas special issues did not provide the jury with a vehicle for
expressing a "reasoned moral response" to evidence of Penry's
mild retardation and child abuse.  See 492 U.S. at 322, 328.  The
fact that Penry was able to introduce and argue the significance
of his mitigating evidence to the jury was not enough.  The jury
should have been instructed "that it could consider and give
effect to the mitigating evidence of Penry's mental retardation

                                13

and abused background by declining to impose the death penalty. . . ." Id. at 328.[5]

The Court first focused on the special issue asking whether the defendant killed "deliberately and with the reasonable expectation that the death of the deceased . . . would result." It reasoned:

> In the absence of jury instructions defining "deliberately" in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue. Without such a special instruction, a juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime "deliberately." Thus, we cannot be sure that the jury's answer to the first special issue reflected a "reasoned moral response" to Penry's mitigating evidence.

Id. at 323.

The Court similarly held that Penry's evidence of mental retardation and child abuse was relevant beyond the scope of the second special issue, which asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The Court specifically focused on the fact that the mitigating evidence

_____

[5] The district court erroneously reads Penry as holding only that "profound retardation . . . cannot be properly accounted for in the two special issues." A straightforward reading of Penry, however, reveals that the mitigating evidence at issue in that case was: (1) evidence that Penry was suffering from "mild to moderate retardation," 492 U.S. at 307-08, and (2) evidence that Penry was repeatedly beaten as a child, see id. at 308-09.

offered by Penry, to the extent it was relevant to the second special issue, was as likely to be aggravating as mitigating. It stated:

> Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.

Id. at 324. "The second special issue, therefore, did not provide a vehicle for the jury to give mitigating effect to Penry's evidence of mental retardation and childhood abuse." Id.

Finally, the Court held that the third special issue, which asks "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased," was an insufficient vehicle for giving mitigating effect to Penry's evidence of mental retardation and child abuse. The Court noted that the evidence presented at trial suggested that Penry "did not stab the victim after she wounded him superficially with a [pair of] scissors during a struggle, but rather killed her after her struggle had ended and she was lying helpless." Id. at 324. And, it concluded that "a juror who believed Penry lacked the moral culpability to be sentenced to death could not express that view in answering the third special issue if she also concluded that Penry's action was not a reasonable response to provocation." Id. at 324-25.

15

b.   <u>The Continued Viability of </u>Penry

The language of Penry, although arguably worded broadly,[6] has been interpreted narrowly.[7]  This court has concluded that "Penry does not invalidate the Texas statutory scheme, and that Jurek v. Texas, [428 U.S. 262 (1976) (rejecting a facial attack to the special issues)], continues to apply, in instances where no major mitigating thrust of the evidence is substantially beyond the scope of all the special issues."  Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992) (en banc), affirmed on other grounds, 113 S. Ct. 892 (1993).  The Supreme Court has similarly indicated that Penry did not effect a "sea change" in its view of the constitutionality of the Texas special issues.  See Graham v. Collins, 113 S. Ct. 892, 901 (1993).

We note initially that a Penry claim can be considered on collateral review only if the petitioner actually proffered the mitigating evidence he contends was beyond the reach of jurors at his capital trial.  See Barnard v. Collins, 958 F.2d 634, 637 (5th Cir. 1992), cert. denied, 113 S. Ct. 990 (1993); May v. Collins, 904 F.2d 228, 232 (5th Cir. 1990), cert. denied, 111 S. Ct. 770 (1991); DeLuna v. Lynaugh, 890 F.2d 720, 722 (5th Cir. 1989); Ex Parte Goodman, 816 S.W.2d 383, 386 n.6 (Tex. Crim. App.

---

[6] See, e.g., Sean Fitzgerald, Note, Walking a Constitutional Tightrope:  Discretion, Guidance, and the Texas Capital Sentencing Scheme, 28 HOUSTON L. REV. 663, 685 (1991); Shelley Clarke, Note, A Reasoned Moral Response:  Rethinking Texas Capital Sentencing Statute After Penry v. Lynaugh, 69 TEX. L. Rev. 407, 434-35 (1990).

[7] See generally Peggy M. Tobolowsky, What Hath Penry Wrought?:  Mitigating Circumstances and the Texas Death Penalty, 19 AMER. J. CRIM. LAW 345 (1992).

17

1991).  However, the petitioner need not have requested an instruction on mitigating evidence; nor must he have objected to the lack of such an instruction.  See Selvage v. Collins, 816 S.W.2d 390, 392 (Tex. Crim. App. 1991) (on certified question from the Fifth Circuit Court of Appeals).

A properly preserved Penry claim will ultimately prove meritorious only if two requirements are met.  See Johnson v. Texas, 113 S. Ct. 2658, 2668-69 (1993) (assessing merits of Penry claim under a two-part framework).  First, the evidence proffered at trial must actually be "mitigating."  It must be evidence that (a) relates to the defendant's character or background, or to the circumstances of the offense, and (b) could lead a reasonable juror to impose a penalty less than death.  See Franklin v. Lynaugh, 487 U.S. 164, 188 (1988) (O'Connor, J., joined by Blackmun, J., concurring in the judgment); see also Lockett v. Ohio, 438 U.S. at 605.  Second, the evidence proffered at trial must have been beyond the "effective reach" of the jury.  In determining whether this requirement has been met, we ask whether there is a "reasonable likelihood" that the jury applied the Texas special issues in a way that prevented consideration of the constitutionally relevant mitigating evidence.  See Johnson, 113 S. Ct. at 2669.[8]

_____

[8] Our en banc decision in Graham articulated a slightly more stringent standard for determining whether a certain type of mitigating evidence is beyond the "effective reach" of jurors. In particular, we asked whether "some major mitigating thrust of the evidence is substantially beyond the scope of any of the [special] issues," see Graham, 950 F.2d at 1027.  Although the Supreme Court did not expressly disapprove of the standard we

18

2.   *Assessing Motley's _Penry_ Claim*

Our assessment of Motley's _Penry_ claim proceeds in three parts.  We necessarily begin with the trial record, which reveals substantial evidence of Motley's abuse as a child.  We then explain why the evidence of child abuse qualifies as constitutionally relevant mitigating evidence rather than "vacuous sentimentality," as the district court deemed it.  Finally, we discuss the extent to which the evidence of child abuse was beyond the "effective reach" of jurors.

a.   <u>Was Motley's _Penry_ claim properly preserved for habeas review?</u>

At the punishment phase of trial, Motley testified that his father began physically abusing him when he was about four or five years old.  Motley recounted one instance when his father beat him until he was "bloody, all over."  On this occasion, Motley recalled, his father "had to put me in a tub of ice to stop the bleeding."  Motley also stated that his father used his head as a battering ram and, on more than one occasion, slammed his head between doors.  Other instruments of abuse included: "belt buckles in the face" and a boxed-in wrench, which his father used to hit Motley "everywhere he could hit."

According to Motley, the abuse by his father did not stop at beatings; it also included sexual and psychological abuse.

---

articulated in <u>Graham</u>, we believe that, after <u>Johnson</u>, the appropriate inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  <u>Johnson</u>, 113 S. Ct. at 2669 (quoting <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990)).

19

Indeed, Motley testified that his father had anal and oral sex with him until he was about thirteen. Although Motley could not recall the number of times his father sexually abused him, he stated that the sexual abuse stopped after his mother threatened to divorce his father. Motley also recounted an incident in which he was punished for not cleaning out his gerbil cage. He stated that his father took his gerbils out and "squashed them" to death in front of him.

Nor was Motley's father the only abuser. His mother often failed to protect him and, on at least one occasion, physically assaulted him herself. Motley specifically recalled an instance where his mother came up behind him with a pool stick and "whacked" him in the back of the head. When he turned around, Motley further recalled, he "got whacked in the mouth." At the punishment phase of trial, Motley pointed to the F-shaped scar on his face which, he contended, was the result of being hit with a pool stick.

Motley's stories of abuse were corroborated by his neighbors, the Howells, who had known Motley since he was three. Margaret Howell recalled that, when Motley was about eight, he spent the night out on a busy highway; she knew this because her son picked Motley up the next morning and brought him to her home. She also remembered Motley being locked out of his home "on one of the bitterest [winter] nights." On one winter day, she continued, she saw Motley being hosed down with cold water by his father in the yard. She further testified that, on numerous

20

occasions, Motley came to her house bruised and bleeding, and that she gave him food and shelter. Mrs. Howell concluded, "He has had a hell of a life." Mrs. Howell's husband, Douglas, also recalled seeing evidence that Motley was being abused. He stated that, although he never actually witnessed any abuse, on several occasions he noticed blood or bruises on Motley's face and skull. He further remembered seeing bars and padlocks on Motley's bedroom window.

Finally, the defense called Dr. Fred Fason, a psychiatrist with extensive experience in treating child abuse victims, who testified about the likely effects of such abuse. He stated that, in his experience, victims of child abuse, "even at the age of eight or ten or twelve, were the kids that were most prone to pick a fight or beat up a younger child, or throw rocks at other kids and engage in behavior that we considered to be anti-social behavior, particularly in relationships to smaller children." He further explained the phenomenon of a child abuse victim's "identification with the aggressor":

> The reason so many parents abuse the children who were abused is what psychoanalysts call identification with the aggressor. In their head, there is the play of the scene of the powerful person who is out to harm the smaller person. It is much better for them to be that powerful person, doing the harm, than the smaller person who is being terrorized. So, this is kind of what, in answer to your question, the effect on the child who is abused as a child, is to terrorize and at the same time to give him the feeling that no one really cares. And . . . that combination leads him then to identify with the powerful figure, the way he conceptualizes the abusing parent, and then acts that out with other people in his life. This is why abused children so frequently get into difficulties with the

21

law or difficulties with their own children, when they become parents.

When sexual abuse is combined with physical abuse, Dr. Fason continued, it becomes "particularly difficult" for the child to cope: "[Y]ou have total separation of sexual feelings from soft and tender feelings to where [the child] becomes incapable of loving in a normal way."

Our review of the record thus reveals substantial evidence that Motley was abused as a child. Indeed, the Texas Court of Criminal Appeals noted that "[a]ll of the evidence . . . presented at the punishment stage of the trial went to the proposition that [Motley] had been abused both physically and sexually as a child and as a result of that abuse, he acted out." Motley v. State, 773 S.W.2d at 290. We thus conclude that Motley has properly preserved his Penry claim for collateral review.[9]

###### b. Was Motley's evidence of child abuse "constitutionally mitigating"?

On appeal, the State contends that Motley's Penry claim lacks merit, because he has not demonstrated that his criminal behavior was attributable to the abuse he suffered as a child. The State points out that Dr. Fason, who testified about the effects of child abuse generally, did not examine Motley and thus

---

[9] The district court erred in holding that Motley, by failing to object to the charge or request an additional instruction, procedurally defaulted his Penry claim. As already discussed, see supra Part III.B.1.b., to preserve a Penry claim for collateral review, a petitioner need only have introduced the allegedly mitigating evidence at trial or offered a bill of exceptions. The petitioner need not have objected to the instructions or requested an additional instruction. See Selvage, 816 S.W.2d at 392.

did not express an opinion as to whether Motley's behavior was the result of child abuse. The State further contends that the evidence of Motley's child abuse "cannot explain his actions, which were inconsistent with Fason's expert opinion." According to the State:

> Fason testified that victims of child abuse react with fear and terror and lash out at perceived threats against them. As confirmed by the trial court's findings on state habeas, . . . those effects do not correlate with Motley's relevant behavior. . . . The facts of Motley's crime belie the argument that he reflexively lashed out at a helpless individual because he was feeling the rage and terror he experienced when he allegedly was abused as a child. Because Motley's evidence provided no reason for a jury to conclude that he was less responsible for his conduct than the average person, it certainly was not probative of a reduced culpability beyond the scope of the special issues.

The State's argument, when stripped to its essentials, is that the evidence of Motley's child abuse is not constitutionally relevant mitigating evidence. The State does not dispute that the child abuse evidence related to Motley's "character or background, or to the circumstances of the offense." Compare Franklin, 487 U.S. at 188 (O'Connor, J., concurring in the judgment) (concluding that any "residual doubt" about a defendant's guilt is not mitigating evidence, because it does not relate to the defendant's character or background, or the circumstances of the offense). Embracing the district court's reasoning, however, the State effectively contends that the child abuse evidence, because it was not linked to the crime by more specific testimony, would not have led a reasonable juror to impose a penalty less than death. See supra Part III.B.1.b.

23

This so-called "nexus" argument is not, in our view, peculiar to the Texas special issues:  it goes to the very core of what qualifies as constitutionally relevant mitigating evidence.[10]

The State is correct to point out that, before evidence will be considered "mitigating" for Eighth Amendment purposes, it must be reasonably likely to militate against imposition of the death penalty.  On several occasions we have rejected Penry claims where the habeas petitioner failed to explore the nexus between the allegedly mitigating evidence and the crime itself.  For example, in Graham v. Collins, we concluded that evidence suggesting petitioner's mother was frequently hospitalized for a mental condition was not constitutionally relevant mitigating evidence.  We reasoned:

> There was no evidence of any effect this had on Graham, or of any reaction on his part to it, and no attempt was even made to explore that subject. . . . There was no suggestion that he was unhappy, withdrawn, moody, difficult to control or the like, or that he had any mental or psychological problems.  The entire thrust of the defense evidence . . . was the exact opposite, namely that Graham was a good, stable, nonviolent, ordinary youth.  There is no substantial evidence that Graham's criminal conduct was "attributable to a disadvantaged background, or to emotional and mental problems," as Justice O'Connor used those terms in Penry.  In this respect, the evidence as a whole is simply not comparable to that in Penry or Eddings.

---

[10] This is also the essence of Judge Davis' argument in dissent.  He does not contend that Motley's evidence of child abuse was within the "effective reach" of jurors.  Rather, he concludes "that the evidence is insufficient to allow a rational juror to attribute this murder to Motley's earlier child abuse." Thus, although he does not expressly say so, Judge Davis would essentially agree with the State and the district court that Motley's evidence of child abuse was not, as a matter of law, "constitutionally relevant mitigating evidence."

24

950 F.2d at 1033 (internal citations omitted); see also Drew v. Collins, 964 F.2d 411, 420 (5th Cir. 1992) (rejecting Penry claim predicated on evidence of troubled childhood, because petitioner presented no evidence of any effect this had on him and made no attempt to even explore the subject), cert. denied, 113 S. Ct. 3044 (1993).

Our cases thus establish that evidence of a petitioner's background or record, in order to be constitutionally mitigating, "must be able to raise an inference `that the crime is attributable to the disability.'" Barnard v. Collins, 958 F.2d at 638 (quoting Graham, 950 F.2d at 1033). This nexus requirement is not, however, as strict as the State or district court would have it. If a jury could reasonably infer, based on the evidence presented at trial, that the crime is in some way attributable to the defendant's disadvantaged background, no more specific nexus is required under our precedent.

We conclude that Motley's jury, based on the evidence of child abuse actually proffered at trial, could have reasonably inferred that Motley's crime was at least in part attributable to his troubled past. Dr. Fason testified that (a) because abused children tend to identify with the aggressor, they frequently "get into difficulties with the law," (b) in his experience, child abuse victims tended to pick on those smaller and more vulnerable and engage in anti-social behavior, and (c) that child abuse victims' bitterness and hatred, if not treated, could lead them to senselessly assault other people. Motley's crime

25

certainly fits this description.  It is especially noteworthy
that his victim, Maria Duran, was indisputably smaller and more
vulnerable than Motley.  Further, shooting such a victim in the
back with a shotgun certainly falls into the category of
senseless, assaultive, antisocial behavior.[11]  We thus believe
that jurors reasonably could have found a nexus between Motley's
history of abuse and the capital crime for which he was
convicted.  Our conclusion is reinforced by the prosecutor's own
statements during closing argument--in particular, his argument
that Motley's child abuse made him mean, extremely mean.[12]

That Dr. Fason did not specifically or hypothetically opine
that the murder was likely the result of Motley's child abuse did
not preclude jurors from making the required inference.  After
all, the effects of child abuse are not peculiarly within the
province of an expert.  As Chief Justice Rehnquist has noted:

---

[11] We fail to understand why Judge Davis finds nothing
inherent about the facts of this crime that suggest it was
related to Motley's earlier child abuse.  The facts Judge Davis
recites clearly show that Motley, by shooting an innocent victim
in the back, acted in a senseless, assaultive, and anti-social
manner.  Moreover, although the evidence was inconclusive on the
question of whether Motley sexually assaulted Duran, the State
did introduce evidence that the crotch of her bathing suit had
been cut--thus raising the specter of physical or sexual abuse.
All of this conduct, in our view, fits squarely within the
testimony of Dr. Fason.

[12] Alluding to persons with disadvantaged backgrounds
generally, and to Motley's child abuse specifically, the
prosecutor stated:

It doesn't excuse them from killing.  It may make them
mean.  It may make them bitter, and I think you have
seen a lot of meanness in this man.  There is a lot of
meanness there.

"It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens." Santosky v. Kramer, 455 U.S. 745, 789 (1982) (Rehnquist, J., joined by Burger, C.J., White, and O'Connor, JJ., dissenting). This common-sense view of child abuse is also reflected in the Court's capital sentencing jurisprudence. In Eddings v. Oklahoma, for example, the Court specifically held that, "when the defendant was sixteen years old at the time of the offense, there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant." 455 U.S. at 115-16 (emphasis added); see also Penry, 492 U.S. at 319 (noting that "evidence about the defendant's background . . . is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse") (emphasis added) (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Moreover, in the context of Penry claims predicated on child abuse, we have never required the type of precise expert "nexus" testimony which the State urges we now require. See Mayo v. Lynaugh, 893 F.2d 683 (5th Cir. 1990) (holding that petitioner's Penry claim based on evidence of child abuse was meritorious--despite the fact that there was no expert testimony at trial about the effects of child abuse), modified, 920 F.2d 251 (5th Cir. 1990), cert. denied, 112

27

S. Ct. 272 (1991).  We decline to impose such a requirement

now.[13]

---

[13] Our refusal to require specific expert testimony regarding the nexus between child abuse and the crime is also supported by other considerations.  First, prior to Penry, no competent defense counsel would have attempted to establish such a precise nexus, because it would have only underscored the double-edged nature of the child abuse evidence.  See May v. Collins, 904 F.2d 228, 234 (5th Cir. 1990) (Reavley, J., joined by King, J., specially concurring) (Before Penry, "defense counsel representing victims of child abuse and mental impairment [were faced] with a tactical dilemma:  (1) either to present the mitigating evidence, which would do more harm than good by bolstering the state's case with regard to future dangerousness, and then to pursue a losing constitutional argument; or (2) to withhold that evidence and hope that other arguments would persuade the jury to impose a life sentence.  Any capable defense attorney would pursue the latter course. . . .), cert. denied, 498 U.S. 1055 (1991); see also infra Part III.B.2.c.  In addition, we note that we have sanctioned the practice of allowing prosecution experts who have not examined the defendant to hypothetically testify about the defendant's future dangerousness, an aggravating factor under the Texas special issues.  See Barefoot v. Estelle, 697 F.2d 593, 596-98 (5th Cir.), aff'd, 463 U.S. 880 (1983).  Surely a capital defendant can, under the reasoning of such cases, satisfy the "nexus" requirement for mitigating evidence by offering the testimony of an expert who explains the usual effects of child abuse.  To require the expert to further render an opinion based on a "hypothetical"--at least with respect to the well-known effects of child abuse--would, in our view, render the definition of mitigating evidence hypertechnical.
Judge Davis, in dissent, does not agree that expert testimony about the effects of child abuse generally can support an inference that Motley's crime was in some way attributable to his disadvantaged background.  Although he would not necessarily require specific expert testimony by a psychiatrist, he would "at least require the defendant to establish through lay testimony the personality traits of the defendant or examples of the defendant's conduct that could be rationally related to his child abuse."  In our view, however, this definition of mitigating evidence--at least with regard to child abuse--is only slightly less hypertechnical than the State's.  It amounts to a conclusion that, absent such lay testimony or more specific testimony by an expert, the documented evidence of Motley's child abuse could have been excluded as constitutionally irrelevant.  Because we do not think that the Eighth Amendment would permit such evidence to be excluded, see Eddings, we decline to embrace Judge Davis' test for determining when evidence of child abuse is constitutionally

28

Nor do we find persuasive the State's argument that, because there was no evidence that Motley reflexively lashed out at Maria Duran, the evidence of child abuse was rendered non-mitigating. The main problem with this argument is that the State has mischaracterized the testimony of Dr. Fason. He did not testify that child abuse victims reflexively "lash out at perceived threats against them." Rather, he stated that, because they identify with the aggressor, such victims are "more prone to <u>pick a fight</u> or beat up a <u>younger child</u>." Picking a fight and beating up younger children cannot fairly be characterized as lashing out at perceived threats. In any event, Motley was not required to establish this type of precise nexus between his crime and his history of child abuse. Such a connection would be difficult, if not impossible, to establish. Moreover, such a precise nexus requirement in the context of mitigating evidence would be inconsistent with the liberal admission of aggravating evidence, which often consists of unadjudicated extraneous offenses having little, if any, similarity to the capital offense.[14]

mitigating.

[14] <u>See</u>, <u>e.g.</u>, <u>Farris v. State</u>, 819 S.W.2d 490, 497 (Tex. Crim. App. 1990) (prosecution introduced evidence that defendant had unlawfully shot a cow and wantonly killed a buffalo at a wildlife refuge), <u>cert. denied</u>, 112 S. Ct. 1278 (1992); <u>Derrick v. State</u>, 773 S.W.2d 271, 274-75 (Tex. Crim. App.) (prosecution introduced evidence that defendant was a homosexual and a male prostitute), <u>cert. denied</u>, 493 U.S. 874 (1989); <u>Kunkle v. State</u>, 771 S.W.2d 435, 446 (Tex. Crim. App. 1986) (prosecution introduced evidence that the defendant had several truancy violations in high school), <u>cert. denied</u>, 492 U.S. 925 (1989); <u>Davis v. State</u>, 597 S.W.2d 358, 361 (Tex. Crim. App.) (Clinton, J., dissenting) (prosecutor argued that defendant was a future danger to society because he had used and sold marijuana), <u>cert.</u>

Finally, we disapprove of the district court's reasoning with regard to the significance of Motley's evidence of child abuse. While it may be correct that not all child abuse victims become murderers, and not all murderers are child abuse victims, this observation does not prevent evidence of child abuse from being constitutionally mitigating. Under the district court's reasoning, a defendant's youth would not be a mitigating factor either, because it is also indisputable that most young people do not murder and that many murderers are not young. Yet, the Supreme Court has recently reaffirmed that youth is quintessential mitigating evidence. See Johnson v. Texas, 113 S. Ct. at 2668 ("There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of Lockett and Eddings.").

As the discussion above indicates, we hold that Motley's evidence of child abuse was constitutionally relevant mitigating evidence, because a jury reasonably could have inferred that his crime was in some way attributable to the abuse. We reject the State's argument that evidence of child abuse, to be constitutionally mitigating, must be specifically supported by an expert opinion that the abuse probably caused the petitioner to commit the crime.[15] This reasoning, when logically extended,

denied, 449 U.S. 976 (1980).

[15] Of course, more specific expert testimony may be necessary to support a jury's inference that the crime is attributable to other types of disabilities. This case is thus

30

would permit the State to exclude evidence of child abuse from the punishment phase altogether unless an expert independently examined the defendant and testified that the crime was attributable to the abuse. There can be no doubt that the exclusion of child abuse evidence in these circumstances would violate the culpability principle underlying Lockett and Eddings. See Burger v. Kemp, 483 U.S. 776, 789 n.7 (1987) ("We have no doubt that this potential testimony [concerning the petitioner's exceptionally unhappy and unstable childhood] would have been

---

entirely distinguishable from the more speculative evidence at issue in Barnard v. Collins, 958 F.2d 634 (5th Cir. 1992), cert. denied, 113 S. Ct. 990 (1993), where we suggested that specific expert testimony was needed to make the evidence mitigating. In that case, the petitioner had introduced evidence that several months before he committed the crime, his son-in-law beat him in the head with a tire iron. Although various family members testified that they thought the head injury affected Barnard, there was no expert testimony establishing that he suffered from any psychological disorders. Nor was there any other kind of affirmative evidence of brain damage, such as hospital records. In holding that the evidence was not mitigating, we reasoned:

> The evidence of the beating [with a tire iron], without more, is insufficient to support a Penry claim. The evidence must be able to raise an inference "that the crime is attributable to the disability." Graham, 950 F.2d at 1033. Here, there is no evidence that the physical trauma from the blows caused Barnard to suffer from mental impairment, or that his criminal actions were attributable to mental impairment. Barnard cannot rely on his mother's inexpert speculation concerning Barnard's mental condition to demonstrate a Penry-type disability. A juror would be compelled to share this speculation to make such a finding.

958 F.2d at 638.

In this case, by contrast, there was expert testimony concerning the effects of child abuse generally. Moreover, as already discussed, the long-term effects of child abuse, unlike the varying effects of head injuries, are well-understood by lay people. See Santosky, 455 U.S. at 789.

31

relevant mitigating evidence that the sentencer could not have refused to consider and could not have been precluded from considering. . . ."). We therefore decline to embrace such reasoning.

      c.    <u>Was the evidence of Motley's abuse beyond the "effective reach" of jurors?</u>

Having held that Motley's evidence of child abuse was constitutionally mitigating, we must now determine whether the Texas special issues provided the jury with an adequate vehicle to give effect to the mitigating evidence. We hold that they did not under the standard most recently articulated by the Court in <u>Johnson</u>. Specifically, we find it reasonably likely that the jury applied the Texas special issues in a way that prevented consideration of the child abuse evidence. <u>See</u> <u>Johnson</u>, 113 S. Ct. at 2669. We thus conclude that Motley's mitigating evidence was beyond the "effective reach" of his jurors.

No one seriously contends that the jury had an adequate vehicle for giving mitigating effect to the evidence of Motley's child abuse under the first special issue, which asks whether the defendant committed the crime deliberately. Such a contention would be without merit. As in <u>Penry</u>, the term "deliberately" was not defined for the jury. <u>See</u> 492 U.S. at 322. Moreover, the State argued, during both voir dire and closing argument, that the term "deliberately" meant essentially the same thing as "intentionally." Thus, like the Supreme Court in <u>Penry</u>, "we cannot be sure that the jury was able to give effect to the mitigating evidence of [Motley's] . . . history of abuse in

32

answering the first special issue." Id. at 232. In short, we agree with Judge Reavley's observation that evidence of child abuse does not "logically" come into play in considering the deliberateness question. See Penry v. Lynaugh, 832 F.2d 915, 925 (5th Cir. 1987), aff'd in part, rev'd in part, 492 U.S. 302 (1989).

Nor does anyone contend that the third special issue, which asks whether the defendant's conduct was unreasonable in response to any provocation by the deceased, could have allowed the jury to give mitigating effect to Motley's evidence of child abuse. In fact, the third special issue was not even submitted to the jury in this case, because the evidence demonstrated that the victim, Maria Duran, had been shot in the back from approximately thirty feet away. The third special issue provided absolutely no vehicle for consideration of Motley's evidence of child abuse. See Penry, 492 U.S. at 324.

The State vigorously contends, however, that Motley's mitigating evidence was not beyond jurors' effective reach under the second special issue. Pointing to testimony from Dr. Fason, who suggested that Motley's problems might be treatable, the State argues that "the jury had a vehicle, in the form of the future dangerousness issue, for giving mitigating effect to the child abuse evidence." The State thus suggests that, because Motley's condition was "transitory," the jury could adequately consider and give mitigating effect to it under the second special issue. We disagree.

33

Dr. Fason did not unequivocally testify, as the State suggests, that Motley's "syndrome is a treatable, curable condition." When asked whether child abuse victims would continue to engage in antisocial behavior, Dr. Fason responded that the problems would continue <u>indefinitely</u> "unless there are certain changes that take place that include the feeling that someone cares, and if they are prevented from acting out that sort of behavior." Dr. Fason further testified that "just removing the victim of child abuse" from the abuser does not automatically provide a cure. On cross-examination, Dr. Fason stated that, in the absence of successful psychotherapy or treatment, the child abuse victim's bitterness and hatred would frequently continue, leading him to perhaps senselessly assault other people. Finally, when specifically asked whether there was a probability that a child abuse victim could be successfully treated in prison, Dr. Fason stated that there was a <u>possibility</u> of successful treatment, but would not say whether there was a <u>probability</u>. The "probability" of a successful treatment, he explained, "depends so much on the individual circumstances of the individual and depends on so many different variables, such as, the skills that he has, his motivations, his spirit, a number of factors."

The problems resulting from Motley's abuse as a child, therefore, are not transitory in the same sense that youth is transitory. Indeed, we have stated that the "limitations attributable to youth are all <u>necessarily</u> transitory." <u>Graham</u>,

34

950 F.2d at 1031; see also Johnson, 113 S. Ct. at 2669 ("The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.").  The limitations attributable to child abuse, by contrast, are not necessarily or even probably treatable; according to Dr. Fason, they are, at best, "possibly" curable.  This possibility is not sufficient, in our view, to support a conclusion that the jury was able to give mitigating effect to Motley's evidence of child abuse under the second special issue.

More importantly, however, the State's argument in this regard ignores that evidence of child abuse is double-edged under the second special issue.  The Court in Penry expressly held so. See 492 U.S. at 324 ("Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.") (emphasis added).  The prosecutor at Motley's trial recognized as much when he argued at the close of the punishment phase that (a) Motley's child abuse may have made him "mean" and (b) the aggression resulting from Motley's child abuse would probably continue, because the time for effective treatment had passed.

The State wrongly reasons that, because of the uncertain potential for treatment of the widely-known deleterious effects of child abuse, the jury could give the evidence mitigating

35

weight under the second special issue.  That child abuse is possibly treatable over time, however, only diminishes the extent to which the evidence is <u>aggravating</u> under the future dangerousness inquiry; it does not allow the jury to give any independent <u>mitigating</u> effect to the evidence under that question.  Put another way, that a child abuse victim may overcome the ill effects of his or her troubled past in no way relates to the defendant's personal culpability, which, as discussed above, <u>see</u> <u>supra</u> Part III.B.1.a., is the central concern of the Supreme Court's modern capital sentencing jurisprudence.[16]  The potential for overcoming the long-term effects of child abuse has little, if anything, to do with the moral culpability of the defendant at the time of the crime. Rather, the potential for successful treatment is simply a utilitarian consideration which is unrelated to the concept of personal culpability.

Finally, we note that our conclusions here fully comport with the Supreme Court's most recent discussion of the second special issue in <u>Johnson v. Texas</u>.  In discussing how a capital defendant's youth differs from the type of mitigating evidence presented in <u>Penry</u>, the Court focused on the fact that the evidence Penry introduced could only be given aggravating weight under the second special issue.  The Court reasoned that, unlike

---

[16] <u>See</u>, <u>e.g.</u>, <u>Tison v. Arizona</u>, 481 U.S. 137, 149 (1987) ("The heart of the retribution rationale [justifying the imposition of the death penalty] is that a criminal sentence must be related to the personal culpability of the criminal offender.").

36

Penry's evidence, "the ill effects of youth that a defendant may experience are subject to change and, as a result, are <u>readily comprehended as a mitigating factor in consideration of the second special issue</u>." <u>Johnson</u>, 113 S. Ct. at 2670 (emphasis added). Unlike youth, which is not only necessarily fleeting, but also does not predispose one to commit violence, the speculation that the ill-effects of child abuse may be treated is not "readily comprehended as a mitigating factor" under the "the forward-looking inquiry" of future dangerousness. <u>Id.</u> The uncertain potential that the "double-edged" character of evidence may be removed does not somehow allow the jury to give the evidence mitigating weight when that evidence simply cannot be given mitigating weight in the first place. See <u>Penry</u>, 492 U.S. at 324 ("The second special issue . . . did not provide a vehicle for the jury to give mitigating effect to Penry's evidence of . . . child abuse."). It is simply "a wash."[17]

Accordingly, we hold that the Texas special issues did not allow Motley's jurors to adequately consider and give effect to

----

[17] Our conclusion that Motley's child abuse evidence was beyond the "effective reach" of the second special issue is further supported by other prosecutorial arguments. The prosecutor specifically noted that, while Motley may have had an "unhappy childhood," the jury charge "<u>does not ask you anything about his childhood</u>." (emphasis added). The prosecutor further stated:

> You know, sometimes the young people will give a parent an extra, hard time, and that parent will overreact, but you see, that is not the issue. <u>That is not the question here</u>, because if it was, every case we had, somebody could come in and sell that to a jury.

(emphasis added).

the evidence that he was severely abused as a child.  The
evidence had almost no relevance to the first and third special
issues.  And, as we have held, with regard to the future
dangerousness issue, it was more likely to be aggravating than
mitigating.  We conclude, under Penry and Johnson, that Motley
was sentenced to death in violation of the Eighth and Fourteenth
Amendments, because his mitigating evidence was beyond the
"effective reach" of jurors.


### III.  CONCLUSION

Although the district court correctly rejected Motley's
ineffective assistance of counsel claim, it erred in rejecting
his Penry claim.  Motley's jury was not provided with a vehicle
for expressing its "reasoned moral response" to his evidence of
child abuse in rendering its sentencing decision.  We therefore
REVERSE the district court's decision denying Motley's petition
for habeas corpus and REMAND with instructions to grant the writ
unless the State retries Motley within 120 days from the issuance
of this court's mandate.[18]


DAVIS, Circuit Judge, dissenting:

---

[18] Under Texas law, Motley is entitled to a new trial to
determine his guilt or innocence, as well as his punishment,
because his offense occurred before the September 1, 1991
effective date of TEX. CODE CRIM. PROC. ANN. art. 44.29(c) (Vernon
Supp. 1993) (allowing court to empanel a jury solely for the
purpose of deciding a convicted capital defendant's penalty under
article 37.071).

I do not find sufficient evidence from the trial record to raise an inference that Motley's criminal conduct in this case is "attributable to" his child abuse as required to establish a **Penry** claim. I would therefore affirm the denial of habeas relief to Motley.

The majority accurately describes the record evidence of abuse visited on Motley during his childhood. The record, however, is absolutely silent on the effect this abuse had on Motley.

To raise an inference that Motley's crime is attributable to his child abuse, I would not necessarily require a psychiatrist to examine the defendant and give an opinion connecting the crime to the child abuse. But if such testimony is not produced, I would at least require the defendant to establish through lay testimony the personality traits of the defendant or examples of the defendant's conduct that could be rationally related to his child abuse. But no one testified for example in this case that Motley was a bully, had difficulty controlling his emotions or conduct, was quick tempered or any similar attributes.

The testimony of Dr. Fason, the psychiatrist who testified briefly in the sentencing phase of the trial is not helpful in connecting Motley's child abuse to this murder. Dr. Fason never met or examined Motley and knew nothing about Motley. His testimony reveals no knowledge (even secondhand knowledge) of Motley's personality traits or conduct. Dr. Fason simply testified abstractly about common effects of child abuse on some

39

individuals' behavior.  In my judgment such abstract testimony, totally unrelated to Motley as an individual, is inadequate to raise a jury inference that Motley's crime is attributable to his child abuse.

Also, I find nothing inherent about the facts of this crime that suggest that it was related to Motley's earlier child abuse. Motley took a sawed off shotgun to a shopping mall intending to rob someone.  According to his confession, Maria Duran was the first person who came along.  He abducted her and forced her to withdraw money from her bank account.  Motley's decision to abduct and rob a small woman rather than a large man is hardly unusual conduct that a rational juror could relate to his earlier abuse.  The evidence did not reveal and the state did not argue that Motley physically abused Ms. Duran before he shot her.  The only definitive evidence relative to the murder itself is that Motley shot Ms. Duran in the back with the shotgun from a distance of about thirty-five feet.

For these reasons, I conclude that the evidence is insufficient to allow a rational juror to attribute this murder to Motley's earlier child abuse.  Accordingly, I would reject the **Penry** claim.